## IN THE UNITED STATES DISTRICT COURT FOR
## THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| NORTH AMERICA PHOTON INFOTECH, LTD., <br><br>       Plaintiff, <br><br> v. <br><br> ACQUIA, INC., <br><br>       Defendant. | Civil Action No. 1:22-CV-12052 (FDS) |

## PLAINTIFF NORTH AMERICA PHOTON INFOTECH, LTD.'S OPPOSITION TO DEFENDANT ACQUIA, INC.'S MOTION FOR SUMMARY JUDGMENT

## TABLE OF CONTENTS

TABLE OF CONTENTS ...................................................................................................i

TABLE OF AUTHORITIES.........................................................................................iii

i.    Introduction ...........................................................................................................1

ii.   Facts.......................................................................................................................2

    a.  The BPRA ......................................................................................................2

    b.  Acquia's Purported Changes To The BPRA...................................................5

    c.  The Mars And Bayer Commissions.................................................................5

iii.  Standard of Review................................................................................................5

iv.   Argument ...............................................................................................................6

    I.    THE SPECIFIC TERMS OF THE BPRA GOVERN
        PHOTON'S COMMISSIONS ......................................................................7

        a.  "The Acquia Partner Program" Document Did Not Provide
            The Program Terms...................................................................................8

        b.  The "January 2015 Acquia Partner Rewards" Document
            Did Not Provide The Referral Fee Terms .............................................10

        c.  The July 2018 "Acquia Partner Program & Partner Rewards"
            Document Did Not Change Any Terms ..................................................11

        d.  The Undisputed Terms Of The BPRA Govern
            Photon's Commission ............................................................................15

    II.   PHOTON HAS ALWAYS BEEN A PREFERRED
        LEVEL PARTNER ....................................................................................15

    III.  PHOTON IS ENTITLED TO ADDITIONAL
        MARS COMMISSION................................................................................16

        a.  Photon Is Entitled To Additional 10% Commission
            On Initial $345,000 Sale........................................................................16

        b.  Photon Is Entitled To Renewal Commissions ..................................17

IV.   PHOTON IS ENTITLED TO ADDITIONAL BAYER
      COMMISSIONS......................................................................................19

          a.   Photon Is Entitled To A 5% Referral Commission .........................19

          b.   Photon Is Entitled To A 5% Co-Selling Commission ....................20

          c.   Photon Is Entitled To A 5% Bonus Commission ...........................20

          d.   Photon Is Entitled To Renewal Commissions................................20

v.   Conclusion ...................................................................................................20

## **TABLE OF AUTHORITIES**

### **Cases**

*Adickes v. S.H. Kress & Co.*,
   398 U.S. 144 (1970).........................................................................................................6

*Anderson v. Liberty Lobby, Inc.*,
   477 U.S. 242 (1986).........................................................................................................6

*Celotex Corp. v. Catrett*,
   477 U.S. 317 (1986).........................................................................................................6

*Greene v. Ablon*,
   794 F.3d 133 (1st Cir. 2015) ..........................................................................................7

*Infinity Fluids, Corp. v. Gen. Dynamics Land Sys., Inc.*,
   No. CIV.A. 12-40004-TSH, 2013 WL 3158094 (D. Mass. June 19, 2013)....................7

*NSTAR Elec. Co. v. Dep't of Pub. Utils.*,
   462 Mass. 381 (2012) ......................................................................................................7

*Petitti v. New England Tel. & Tel. Co.*,
   909 F.2d 28 (1st Cir. 1990) .............................................................................................6

*Steffen v. Viking*,
   441 F. Supp. 2d 245 (D. Mass. 2006) ............................................................................6

### **Other Authority**

§ 2727 Grounds for Summary Judgment—Burden of Proof and Presumptions:
Generally, 10A Fed. Prac. & Proc. Civ. § 2727 (4th ed.)..................................................6

### i.    **Introduction**

Plaintiff North America Photon Infotech, Ltd. ("Photon") respectfully submits this Opposition to defendant Acquia, Inc.'s ("Acquia") Motion for Summary Judgment.

This action concerns unpaid commissions due and payable by Acquia to Photon pursuant to the terms of the Acquia Business Partner Referral Agreement (the "BPRA") (attached to Shenberger S.J. Decl. (ECF No. 158) at Ex. A). The BPRA entitled Photon to a 5% commission for referring/sourcing a customer to Acquia, a 5% commission for co-selling/influencing the deal, and a 5% bonus commission for both referring and co-selling. *See* BPRA, Section 6. Photon referred and co-sold two of its long-standing business partners, Mars Information Services, Inc. ("Mars") and Bayer AG ("Bayer"), to Acquia, but Acquia failed to pay Photon all commissions for these deals and their renewals.

***First***, Acquia's position that Photon is not entitled to these commissions is based on a fundamental misreading of the BPRA, which was never amended. Section 6 provided that Photon was entitled "to receive the source, co-sell and bonus Referral Fees totaling 15%," and nothing in the BPRA capped commissions or barred renewal commissions.

***Second***, Acquia argues that documents entitled "The Acquia Partner Program" and "January 2015 Acquia Partner Rewards" (attached to Shenberger S.J. Decl. at Ex. B and Ex. C, respectively) set forth the Program Terms and Referral Fee Terms (both defined terms in the BPRA), respectively, and limited Photon to the commissions Acquia has already paid. Acquia claims that these documents were accessible by clicking on embedded hyperlinks in the BPRA. However, at least one of the links was inoperable when the BPRA was executed, and Acquia cannot confirm that these documents were in fact the documents that would appear when someone clicked the links. Indeed, Photon denies these documents were part of any agreement.

**Third**, Acquia argues that changes to commission calculations were made in July, 2018 in the "Acquia Partner Program & Partner Rewards" document (attached to Shenberger S.J. Decl. at Ex. G), but Acquia did not provide this document to Photon and Photon never agreed to these changes. **Fourth**, Acquia argues that Photon was entitled to reduced commissions because it was downgraded from a Preferred to a Foundation level partner, but Acquia continued to describe Photon as a Preferred level partner and paid Photon at the Preferred partner level on other deals. **Fifth**, according to Acquia's internal records, Photon referred and co-sold both Mars and Bayer to Acquia. **Sixth**, Photon is entitled to commissions on the renewals of the Mars and Bayer deals because the purported 2018 changes, which did not apply to Photon, were the first time that Acquia attempted to end renewal commissions—in other words, the fact that Acquia tried to add such a limitation in 2018 proves that renewals were part of the original agreement.

For these reasons and others discussed below, Acquia's motion must be denied.

### ii.    Facts

#### a.    The BPRA

On August 12, 2015, the Parties entered into the BPRA. *See* Photon's Response to Acquia Statement of Material Facts ("PRSMF"), ¶3. Section 1 of the BPRA provided that Photon "will be compensated for sales of Acquia products to Customers as set forth herein." Photon's Statement of Additional Material Facts ("PSAMF"), ¶23.

The first paragraph of the BPRA attempted to incorporate by hyperlink (the "First Link") the "Program Terms located at https://www.acquia.com/sites/default/files/collateral/20150417-ds-partner-prog-at-glance-0360.pdf". PSAMF, ¶22. Acquia no longer has access to and does not know what document was actually tied to the First Link. PRSMF, ¶4, Second, Third, Fourth and

Sixth paragraphs. Nevertheless, Acquia now claims that a document titled "The Acquia Partner

Program" (attached to Shenberger S.J. Decl. at Ex. B) was the document tied to the First Link.

Section 2 provided:

> Acquia hereby appoints [Photon] a non-exclusive Business Partner at the Preferred
> partner level provided the [Photon] achieves Acquia certification for six (6)
> [Photon] personnel by December 31, 2015 and provided that [Photon] achieves
> Acquia certification at the then current requirement for the 2016 calendar year….
> Acquia also reserves the right, in its sole discretion, to upgrade [Photon] to a higher
> partner level. ***All changes to a partner level will be communicated to [Photon].
> Any Leads registered by [Photon] or any Qualified Leads converted to Customer
> after such notification date will be calculated at the new partner level***.

PSAMF, ¶24 (emphasis added).

Sections 5 and 6 set forth the criteria for Photon to receive commissions for

referring/sourcing customers to Acquia, and provided:

> **5. LEAD QUALIFICATIONS**. For each Lead, Partner will promptly complete
> and submit to Acquia a copy of the dela registration form available on Acquia's
> Business Partner portal (the "Deal Registration Form"). Acquia will notify Partner
> of Acquia's acceptance or rejection of a Lead within seven (7) business days from
> its receipt of the Deal Registration Form. An accepted Lead is referred to herein as
> a "Qualified Lead". Acquia may reject a Lead for any of the following reasons: (a)
> it has already submitted a proposal to such Lead for the same opportunity registered
> by Partner, (b) Acquia has had one or more face-to-face meetings or substantial
> phone conversations with such Lead for the same opportunity registered by Partner
> during the six (6) months preceding the receipt of the Deal Registration Form, (c)
> Acquia has already received a referral for such opportunity from a third party, or
> (d) Acquia has already logged the opportunity in its sales lead system.
>
> **6. REFERRAL FEES**. For each Qualified Lead that purchases Acquia Products,
> Acquia will pay to Partner the applicable referral fee ("Referral Fee") set forth in
> the        Referral        Fee        Terms        located        here:
> https://partners.acquia.com/sites/default/files/library/attachment/acquia_partner_r
> ewards_2015.pdf [(the "Second Link")]

PSAMF, ¶25. Acquia claims that a document titled "January 2015 Acquia Partner Rewards"

(attached to Shenberger S.J. Decl. at Ex. C) was the Referral Fee Terms document tied to the

Second Link in Section 6. Photon disputes that claim. PRSMF, ¶4, First, Third, Fifth and

Seventh paragraphs.

Section 7 set forth the criteria for Photon to receive commissions for influencing/co-

selling customers to Acquia, and provided:

> **INFLUENCE FEES**. Partner may receive influence fees as set forth in the
> Program Terms ("Influence Fees") pursuant to the Influence Fee Terms, outlined
> in the Program Terms. Partner may be eligible for an Influence Fee only when
> Partner assisted Acquia in the sale of the Acquia Products to such Lead.
> "Assistance" means participated in RFP's, demonstrations, proof of concepts in
> conjunction with Acquia. Parter must notify their Acquia Channel Manager to be
> considered for Influence Fees prior to a Qualified lead executing a contract with
> Acquia for Acquia Products. The determination of Influence Fees will be made
> solely by Acquia and will be communicated to Partner in writing. Influence Fees
> are not issued for Customer subscription renewals unless Partner has met or
> exceeded its minimum referral set forth in the Program Terms for the year in which
> the Customer renewal is committed to Acquia. Influence Fees are limited to 10%
> for any Lead. If multiple partners are eligible to receive an Influence Fee for the
> same Lead, Acquia will determine, in consultation with all involved partners, but
> in its sole discretion, how much Influence Fee each partner will receive and will
> notify each partner in writing of their allocation.

PSAMF, ¶26.

Importantly, Section 6 clarified any ambiguity or doubt about Photon's commissions:

> For the avoidance of doubt, in order for Partner to receive the source, co-sell and
> bonus Referral Fees totaling 15% set forth at the link above, Partner must meet the
> following criteria:
> - Make introductions of Acquia to key stakeholders
> - Help to set up meetings (in person or over the phone)
> - Provide light qualification information – Budget, Authority, Need
>   and Timeline

PSAMF, ¶27. Nothing in Section 6 or elsewhere in the BPRA placed a cap on Photon's

commissions or barred Photon from receiving commissions on renewals. PSAMF, ¶28.

Section 15 provided that "[t]he Agreement and all of its provisions may not be amended

or waived unless agreed upon in writing signed by the parties hereto." PSAMF, ¶29. The sole

exception to Section 15 was Section 1, which provided that only the "Program Terms are subject

to change and/or discontinuance by Acquia upon thirty (30) days notice to Partner via Acquia's Business Partner Portal." *Id*.

b. **Acquia's Purported Changes To The BPRA**

In July 2018, through a single document titled "Acquia Partner Program & Partner Rewards" (attached to Shenberger S.J. Decl. at Ex. G), Acquia attempted to change both the Program Terms document purportedly tied to the First Link and the Referral Fee Terms document purportedly tied to the Second Link. PSAMF, ¶30. These purported changes included (i) changing the names and number of partner levels, (ii) capping commissions to $50,000 per deal, (iii) capping commissions for Foundation level partners to 5%, (iv) removing the 5% bonus commission for partners who both referred and co-sold, and (v) barring renewal commissions. *See* July 2018 "Acquia Partner Program & Partner Rewards" (attached to Shenberger S.J. Decl., Ex. G at Acquia000663-666).

Acquia did not provide Photon with notice or a copy of this document. PRSMF, ¶11. Photon never agreed to any of these purported changes. PRSMF, ¶14, Third paragraph.

c. **The Mars And Bayer Commissions**

Photon, which had pre-existing business relationships with Mars and Bayer, referred and co-sold lucrative opportunities with both companies to Acquia. As discussed below, Acquia failed to pay Photon all commissions due and payable to Photon for referring and co-selling those deals and their renewals.

iii. **Standard of Review**

A "party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if

any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The movant must "show that there is an absence of evidence to support the nonmoving party's case." *Id.* at 325. The burden of persuasion imposed on the movant is a stringent one. § 2727 Grounds for Summary Judgment—Burden of Proof and Presumptions: Generally, 10A Fed. Prac. & Proc. Civ. § 2727 (4th ed.). Summary judgment should not be granted unless it is clear that a trial is unnecessary, *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986), and any doubt as to the existence of a genuine issue for trial should be resolved against the moving party, *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 158–159 (1970). "In determining whether a factual dispute is 'genuine,' the Court must determine whether the evidence is such that a reasonable [factfinder] could return a verdict for the nonmoving party." *Steffen v. Viking*, 441 F. Supp. 2d 245, 250 (D. Mass. 2006) (citing *Anderson*, 477 U.S. at 255). "In assessing the evidence, [courts] will review the material presented in the light most favorable to the non-movant, and [] must 'indulge all inferences favorable to that party.'" *Petitti v. New England Tel. & Tel. Co.*, 909 F.2d 28, 30–31 1st Cir. 1990).

### iv.    <u>Argument</u>

To prevail on its motion, Acquia has the burden of demonstrating that there are no disputed material facts concerning *all* of the following: (i) Photon agreed to amend the BPRA, (ii) the purported Program Fees and Referral Fee Terms documents purportedly tied to the BPRA's First and Second Links existed and were accessible by Photon, (iii) the July 2018 "Acquia Partner Program & Partner Rewards" document was provided to and agreed to by Photon, (iv) Photon was downgraded from a Preferred partner level to a Foundation level partner in accordance with the BPRA's terms, (v) Photon did not refer or co-sell Mars to Acquia, (vi) Photon did not refer or co-sell Bayer to Acquia, and (vii) Photon is not entitled to commissions

on the renewals of the Mars and Bayer deals. However, there are many material, disputed facts that must be decided by the trier of fact.

## I.     THE SPECIFIC TERMS OF THE BPRA GOVERN PHOTON'S COMMISSIONS

Pursuant to Section 6 of the BPRA, *which was never amended*, Photon was entitled to 15% of all opportunities it referred and co-sold to Acquia and all renewals of same. Acquia ignores these terms of the BPRA and instead relies on (i) the "The Acquia Partner Program" document purportedly tied to the First Link, (ii) the "January 2015 Acquia Partner Rewards" document purportedly tied to the Second Link, and (iii) the July 2018 "Acquia Partner Program & Partner Rewards" document. Even if these documents could override the express and specific terms of the BPRA itself, and they do not, Acquia cannot demonstrate as a matter of law that these documents were effective as to Photon.

To be sure, "[e]xtrinsic materials may be incorporated into a contract by reference as long as 'the language used in the contract ... clearly communicates that the purpose of the reference is to incorporate the referenced material into the contract (rather than merely to acknowledge that the referenced material is relevant to the contract, e.g., as background law or negotiating history).'" *Greene v. Ablon*, 794 F.3d 133, 145 (1st Cir. 2015) (quoting *NSTAR Elec. Co. v. Dep't of Pub. Utils.*, 462 Mass. 381, 394 (2012)) (brackets omitted).

But the documents purportedly tied to the First and Second Links must have actually existed and been accessible by Photon. Acquia cannot confirm or verify that "The Acquia Partner Program" and "January 2015 Acquia Partner Rewards" documents were in fact the documents on the other side of the First and Second Links. The Second Link did not even work when the parties signed the BPRA. Acquia cannot rely on a supposed document tied to an inoperable hyperlink. *See Infinity Fluids, Corp. v. Gen. Dynamics Land Sys., Inc.*, No. CIV.A.

7

12-40004-TSH, 2013 WL 3158094, at *5 (D. Mass. June 19, 2013) (where GDLS moved to compel arbitration based on Terms and Conditions referenced in a website link embedded in a purchase order, "the Court agree[d] with Infinity that the link … located in the text of the [purchase order's] first page was likely inoperable in 2009 [and] [h]ad this link been the only reference to the Terms and Conditions, GDLS would have failed to provide Infinity with adequate notice of the arbitration language contained therein").

Furthermore, the purported changes to commission calculations set forth in the July 2018 "Acquia Partner Program & Partner Rewards" do not apply to Photon because Photon did not receive the document and never agreed to any changes. Accordingly, the only terms that govern Photon's commissions are those specifically and expressly set forth in the BPRA itself.

### a.  **"The Acquia Partner Program" Document Did Not Provide The Program Terms**

According to Acquia's corporate designee, Molly Shenberger ("Shenberger"), the First Link "is tied to a PDF document" that "contains the Program Terms that are referenced as a capitalized term within this first sentence" of the BPRA. PRSMF, ¶4, Sixth paragraph. Acquia claims that "The Acquia Partner Program" document (attached to Shenberger S.J. Decl. at Ex. B) is the document that set forth the Program Terms. Acquia is incorrect.

Shenberger avers that this document bears the filename "ds-partner-prog-at-a-glance-0360.pdf", *see* Shenberger S.J. Decl., ¶3 (ECF No. 158), but that is different than the filename included in the First Link, specifically "*20150417-*ds-partner-prog-at-a-glance-0360.pdf." PRSMF, ¶4, Second paragraph. Indeed, Shenberger testified that she did *not* know if the "The

Acquia Partner Program" document was the same Program Terms document referenced in the first paragraph of the BPRA and supposedly tied to the First Link:[1]

> Q. Is Exhibit 36 the document that is referenced in the first sentence of the first paragraph of the Partner Referral Agreement?
>
> A. I don't know for sure if this is the document there, but it would be something like this. Like, if we were putting it on Acquia.com, which is our public-facing website, it would be something like this. That is sort of -- you know, it's generic about our Partner Program. You know, it doesn't go into great detail about commission calculations and things that we would reserve only for a signed partner to review.
>
> …
>
> Q. Is it Acquia's testimony today that Exhibit 36 is not the Program Terms document referenced in the first sentence of the first paragraph of the Partner Referral Agreement?
>
> A. I'm not saying that it's not. I'm saying that I'm not certain that it is.

PRSMF, ¶4, Sixth paragraph.

Acquia does not know if "The Acquia Partner Program" document was the Program Terms document tied to the First Link because the link no longer works and was last accessible at the end of 2018 or early 2019. PRSMF, ¶4, Fourth paragraph. Acquia stored the BPRA itself on Salesforce (its internal management system), but it did not store the Program Terms document that was purportedly tied to the First Link. PRSMF, ¶4, Third paragraph. Nor did Acquia provide Photon with a hard copy of the Program Terms document. PRSMF, ¶4, Fourth paragraph.

Thus, at a minimum, the parties dispute whether "The Acquia Partner Program" document (attached to Shenberger S.J. Decl. at Ex. B) is the Program Terms document that was tied to the First Link.

---

[1] Deposition Exhibit 36 (Acquia001328-1335) (attached to Pinta Decl., Ex. M) is the same document attached as Ex. B (Acquia001328-1335) to the Shenberger S.J. Decl.

**b.  The "January 2015 Acquia Partner Rewards" Document Did Not Provide The Referral Fee Terms**

According to Acquia, the "January 2015 Acquia Partner Rewards" document (attached to Shenberger S.J. Decl. at Ex. C) was tied to the Second Link and set forth the Referral Fee Terms.

The Second Link did not work. On August 11, 2015—a day before the BPRA was fully executed—a Photon representative emailed Shenberger that "[t]he link under the referral fee section still doesn't work." PRSMF, ¶4, Fifth paragraph. Shenberger does not know if she clicked the Second Link and does not recall clicking the Second Link. *Id*. Sanjiv Lochan ("Lochan"), who was Photon's Chief Operating Officer and reviewed the BPRA before it was executed and any documents that would have been accessible via its hyperlinks, does not recall seeing any term or provision that placed a cap on Photon's commissions.[2] PRSMF, ¶4, Seventh paragraph. He never would have approved the BPRA, and Photon never would have signed the BPRA, had it placed a cap on commissions. *Id*. Acquia does not know if Photon was able to access or review the document purportedly tied the Second Link. PRSMF, ¶4, Fifth paragraph.

Even Shenberger does not know what document set forth the Referral Fee Terms. When asked, "Is the document that's entitled 'January 2015 Acquia Partner Rewards' the same thing as program terms?", she answered "Yes." *Id*. But the Program Terms and the Referral Fee Terms are different.

It is not surprising that Acquia cannot identify the actual Referral Fee Terms document. The Second Link no longer works. PRSMF, ¶4, Fifth paragraph. Acquia does not know the last time anyone at Acquia accessed the Second Link. *Id*. Acquia did not provide Photon with a hard

---

[2] The "January 2015 Acquia Partner Rewards" document upon which Acquia relies includes a cap on commissions ($150,000 cap with a maximum award of $50,000 for each 5% rebate). *See* Shenberger S.J. Decl., Ex. C at Acquia000657.

copy of the document purportedly tied to the Second Link. *Id.* And Acquia did not save a copy of the Referral Fee Terms document to Salesforce. PRSMF, ¶4, Third paragraph.

Thus, at a minimum, the parties dispute whether the "January 2015 Acquia Partner Rewards" document (attached to Shenberger S.J. Decl. at Ex. C) is the Referral Fee Terms document that was purportedly tied to the Second Link.

**c.  The July 2018 "Acquia Partner Program & Partner Rewards" Document Did Not Change Any Terms**

Even if the "The Acquia Partner Program" and "January 2015 Acquia Partner Rewards" documents existed and were accessible via the First and Second Links, which is very much disputed, the changes that Acquia attempted to institute in its July 2018 "Acquia Partner Program & Partner Rewards" were not effective as to Photon.

*First*, Acquia failed to send the revised terms to Photon. PRSMF, ¶11. Nevertheless, Acquia claims that, "[i]n or around January 2018, Acquia sent notice via email blast to all participants in the Acquia Partner Rewards Program, including Photon, advising them of revised terms relating to the calculation of partner rewards and other program changes." Shenberger S.J. Decl., ¶8 (ECF No. 158). But Photon did not receive the referenced email, and Acquia has no confirmation that it sent the email to Photon or that Photon received it. PRSMF, ¶11. In fact, the "email" upon which Acquia relies does not indicate what year it was purportedly sent. *Id*.

*Second*, Photon never agreed to change any Referral Fee Terms, which are different than the Program Terms. "The Acquia Partner Program" document that was supposedly tied to the First Link and detailed the Program Terms merely provided general information about the referral program and the different partner levels at that time (Community, Preferred, and Global-Select). *See* Shenberger S.J. Decl., Ex. B at Acquia001335. It does not provide any information whatsoever about how to calculate commissions, including the amount or percentage of referral

and co-selling commissions, whether there was a bonus commission for doing both, whether there was a cap on commissions, or whether the partner received commissions for renewals. *Id*. Shenberger herself testified that the supposed Program Terms document "doesn't go into great detail about commission calculations and things." PRSMF, ¶14, Third paragraph.

On the other hand, the "January 2015 Acquia Partner Rewards" document that was supposedly tied to the Second Link and discussed the Referral Fee Terms provided that Photon received commissions of 5% for sourcing/referring, 5% for co-selling/influencing, and a 5% bonus for doing both. *See* Shenberger S.J. Decl., Ex. C at Acquia000656-657. This document does not bar renewal commissions. *Id*.

The BPRA treated the Program Terms and Referral Fee Terms, each a separately defined term, differently.[3] While the "Program Terms are subject to change and/or discontinuance by Acquia upon thirty (30) days notice to Partner," BPRA, Section 1, all other terms, including the Referral Fee Terms, were subject to Section 15 which provided that "[t]he Agreement and all of its provisions may not be amended or waived unless agreed upon in writing signed by the parties hereto." BPRA, Section 15. Thus, even if Acquia could unilaterally change the Program Terms which provided general information about partner levels, without Photon's written consent Acquia could not change the Referral Fee Terms which purportedly provided how commissions were calculated. Photon never agreed to the changes set forth in the July 2018 "Acquia Partner Program & Partner Awards" document. PRSMF, ¶14, Third paragraph.

***Third***, discovery revealed that Acquia attempted to unilaterally change the commission calculations pursuant to Section 1 of the BPRA based on its incorrect belief that the commission

---

[3] Acquia refers to the "The Acquia Partner Program" document as the Program Fees. Tellingly, however, Acquia does not refer to the "January 2015 Acquia Partner Rewards" document as the Referral Fee Terms.

calculations were detailed in the Program Terms. Shenberger testified that the purported changes in 2018 to the "***Program Terms*** that are identified in the first sentence of the first paragraph of the Partner Referral Agreement" "changed the names of the partner levels within the program ***and the commission percentages owed to partners***, provided the opportunity, met the eligibility criteria and the partner met the eligibility criteria to be paid -- ***the percentages that they would be owed***." PSAMF, ¶31 (emphasis added).

She further testified that the *Program Terms* (i) provided the criteria for Photon to receive commissions, PSAMF, ¶34, (ii) provided "what would be eligible for partner commissions, which is what that Program Terms document is primarily documenting," PSAMF, ¶35, (iii) "detailed what types of deals are in the scope for partners to receive payment and the criteria that must be met for those payments to be made," *id*. (iv) included "[d]etails about the types of opportunities or deals that are in scope for partner commissions and the criteria partners must meet to receive payment," *id*., and (v) "indicated that renewals are not in scope for partner commissions [and] Acquia pays partner commissions based on the first term of a new subscription sale," PSAMF, ¶36. However, these terms were included in the purported Referral Fee Terms document (to the extent it existed and was accessible), not the Program Terms.

Based on its misunderstanding of what document provided what information, Acquia incorrectly claims it could change the commission calculations per Section 1 of the BPRA:

> Q.    You testified on behalf of Acquia earlier that the Program Terms document is different than the document that's referenced in Section 6, correct?

> A.    The document linked in the first sentence of the agreement -- I believe is different than the document linked in Section 6 of the agreement. The document in the first sentence is referred to as "Program Terms." However, the details about the commission program or the criteria for, you know, for partners to be paid commissions is -- it's referred to here as the "Referral Fee Terms."

I mean, I think that, to me, is the Program Terms. I think the document in the first sentence is sort of mislabeled. ***But, yes, I mean, I believe that Acquia has, you know, the right to change the details in either of those documents***.

Q.    Ms. Shenberger, just so the record is clear, I'm not asking for your personal belief; I was asking for Acquia's belief. Do you understand that?

A.    Yes. It's Acquia's belief that we can make those changes.

…

Q.    And you would agree with me that the term "Program Terms" is a defined term, correct?

A.    (No response.)
…
Q.    And that "defined term" is established when you look at the first sentence of the first paragraph of the Partner Referral Agreement, correct?
…
A.    So I can see in that first sentence "Program Terms" is listed. It's capitalized.

Program Terms are referenced in the agreement elsewhere. For instance, in Section 7, "Partner may receive influence fees as set forth in the Program Terms..."

The Program Terms document list linked in that first sentence does not – you know, it doesn't go into great detail about, you know, the criteria to receive the influence or the co-sell fees.

***So I agree that "Program Terms" is the term or the phrase used in the first sentence. But I would say that the Program Terms is sort of a combination of that, you know, of the document that is linked in the first sentence and the document that's linked in Section 6***.

PSAMF, ¶33 (emphasis added). Acquia's position that it could unilaterally change how commissions were calculated is based on a fundamental misreading of the BPRA. At a minimum, the parties dispute whether the July 2018 "Acquia Partner Program & Partner Reward" document (attached to Shenberger S.J. Decl. at Ex. G) applies to Photon.

### d. **The Undisputed Terms Of The BPRA Govern Photon's Commissions**

The terms expressly and specifically set forth in the BPRA control Photon's commissions. Even if the "The Acquia Partner Program," the "January 2015 Acquia Partner Rewards," and the July 2018 "Acquia Partner Program & Partner Rewards" documents could override the BPRA's express terms, and they cannot, they do not here because (i) Acquia is unable to confirm that "The Acquia Partner Program" was the Program Fees document behind the First Link, (ii) Acquia is unable to confirm that the "January 2015 Acquia Partner Rewards" document was the Referral Fees Document behind the Second Link, and (iii) the July 2018 revisions were not effective (at least as to the Referral Fee Terms and calculating commissions).

To the extent there is any ambiguity or doubt as to how to calculate Photon's commissions, Section 6 of the BPRA resolves the issue:

> ***For the avoidance of doubt***, in order for Partner to receive the source, co-sell and bonus Referral Fees totaling 15% set forth at the link above, Partner must meet the following nonexhaustive, minimum criteria:
> - Make introductions of Acquia to key stakeholders
> - Help to set up meetings (in person or over the phone)
> - Provide light qualification information - Budget, Authority, Need and Timeline

BPRA, Section 6 (emphasis added). Notably, the BPRA does not cap Photon's commissions or limit commissions only to the first-year of annual subscriptions. Indeed, after this dispute arose, Acquia's Timothy Bertrand informed Photon's Chief Executive Officer, Srinivas Balasubramanian, that Photon was entitled to a 15% commission on these deals. PRSMF, ¶6.

## II.    **PHOTON HAS ALWAYS BEEN A PREFERRED LEVEL PARTNER**

Acquia claims that Photon was eligible for reduced commissions because it dropped from a Preferred level partner (which allowed Photon to receive up to 15% commissions) to a Foundation level partner (which permitted lower percentage commissions) beginning in 2016 as

15

a result of Photon not certifying six engineers by December 31, 2015. Shenberger S.J. Decl., ¶7

(ECF No. 158). Acquia is incorrect.

Section 2 of the BPRA provides that "[a]ll changes to a partner level will be

communicated to [Photon]. Any Leads registered by [Photon] or any Qualified Leads converted

to Customer after such notification date will be calculated at the new partner level." BPRA,

Section 2. Acquia did not communicate any supposed reduction in partner level to Photon.

PRSMF, ¶13. In fact, after December 31, 2015, Acquia described Photon as a Preferred partner

and *repeatedly* paid Photon commissions at the Preferred partner level. *Id*. At a minimum, the

parties dispute whether Photon was a Preferred level partner entitling it to higher commissions.

## III.    PHOTON IS ENTITLED TO ADDITIONAL MARS COMMISSIONS

Photon registered Mars as a Qualified Lead on Acquia's Deal Registration Portal.

PRSMF, ¶14. Acquia sold $345,000 in products to Mars, plus an additional $26,410 in add-on

products. *Id*. Acquia paid Photon a 5% referral commission ($17,250) on the initial $345,000

sale, and a 15% commission (5% referral + 5% co-sell + 5% bonus for referring and co-selling)

($3,961.50) on the add-on products. *Id*.

### a.    Photon Is Entitled To Additional 10% Commission On Initial $345,000 Sale

Acquia failed to pay Photon an additional 10% commission on the initial sale of

$345,000, specifically 5% for co-selling and a 5% bonus for both referring and co-selling.

Acquia claims Photon's commission is limited to the 5% already paid because, according to

Acquia, Photon was a Foundation level partner and the terms of the July 2018 "Acquia Partner

Program & Partner Rewards" capped commissions for Foundation level partners at 5%.

*First*, Photon successfully referred and co-sold Mars to Acquia. Acquia listed Photon as

both the referrer and co-seller on its internal tracking system for Mars. PRSMF, ¶14, Fourth

16

paragraph. *Second*, as explained above, Photon was a Preferred level partner. PRSMF, ¶13. A *subsequent* Acquia Partner Referral Payment Request, dated Nov. 1, 2019, for the *Mars* add-on products *completed by Acquia* states Photon was a Preferred partner and entitled to a 15% commission. PRSMF, ¶14, Fifth paragraph. Acquia paid Photon that 15% commission. *Id*. *Third*, as explained above, Photon never agreed to Acquia's purported changes in 2018 about calculating commissions. Section 6 of the BPRA provided that Photon was entitled to a 15% commission when it both referred and co-sold, as it did here for Mars.

**b.  Photon Is Entitled To Renewal Commissions**

Mars renewed its deal with Acquia several times for millions of dollars, but Acquia failed to pay Photon commissions for those renewals. PRSMF, ¶15; PSAMF, ¶39. Acquia claims that, "[u]nder the express limitations of the Agreement and the 2018 Rewards Program terms, Photon has no claim to referral fees on renewals or upgrades beyond the initial annual subscription…." Memorandum at 12 (ECF No. 159). Acquia is wrong for multiple reasons.

*First*, to the extent Acquia claims that Photon was not entitled to renewal commissions before the 2018 attempted changes, it would be wrong. Section 7 of the BPRA expressly entitled Photon to receive commissions for renewals: "Influence Fees are not issued for Customer subscription renewals unless Partner has met or exceeded its minimum referral set forth in the Program Terms for the year in which the Customer renewal is committed to Acquia." BPRA, Section 7. Photon referred deals with subscriptions worth more than $100,000. *See* Shenberger S.J. Decl., Ex. B at Acquia001335; PRSMF, ¶¶14, 16-17; PSAMF, ¶39.

*Second*, during negotiations that led to the BPRA, Photon rejected Acquia's proposal to limit commissions to only first year subscriptions. On July 29, 2015, Shenberger emailed Photon's Vijay Iyer the following:

> We [Acquia] had proposed the following for Compensation:
> **- 15% on new subscriptions bookings for year 1 only**, provided Photon assists with the following:
>> - Introductions to the customer and key stakeholders within the organization
>> - Assistance in scheduling meetings and phone calls as necessary
>> - Helps us to identify BANT - Budget, Authority, Need, and Timeline

PRSMF, ¶15, Fourth paragraph. On August 5, 2015, a Photon representative emailed Shenberger the following: "We want it for the Term of the agreement, not just first year. Can we have a quick call to clarify?" *Id*. The language included in Section 6 of the BPRA does not limit commissions to only the first-year subscription amount.

*Third*, while the "January 2015 Acquia Partner Rewards" document purportedly tied to the Second Link did include a $150,000 cap on commissions, *see* Shenberger S.J. Decl, Ex. C at Acquia000657, that document does not apply or govern commissions calculations for the reasons explained above. The BPRA controls and it does not place any cap on commissions.

*Fourth*, even if the "January 2015 Acquia Partner Rewards" document applies, it does not limit commissions to only first-year subscriptions. Acquia attempted to initiate that change for the first time in the non-agreed to 2018 revisions. *Compare* "January 2015 Acquia Partner Rewards" (not discussing first year subscriptions or renewals), *with* July 2018 "Acquia Partner Program & Partner Awards," which provides:

> Rewards Calculations
> - Partners that Source opportunities (but don't also co-sell) are eligible to receive rewards (up to 5% *of the first year's subscription*). Partners that co-sell opportunities (but don't also source) are eligible to receive rewards (up to 5% *of the first year's subscription*). Partners that do both are eligible to receive up to 10% *of the first year's subscription*.
> - Acquia **NEVER** pays/credits more than **10%** of the value *of the first year of a subscription in rewards*. In the event that a Partner Sources and Co-sells a deal, and another Partner also Co-sell, Acquia will determine how to distribute rewards across both partners. These percentages are adjusted if a reseller is involved (see details below). If a third partner is co-selling in this scenario, they will **not** be rewarded 5%.

- If opportunities are routed through a reseller or procurement vehicle, the reseller's margin will be subtracted from the 10% available to be rewarded to partners and percentages will be recalculated so that they do not exceed 10% *of the first year subscription value*.
- ***Renewals are not eligible for Partner Commissions or Partner Credits***.
- If there is an upsell subscription component bundled in with a renewal that a partner sourced or co-sold, and the value of the upsell subscription component is more than $10,000, we will calculate rewards according to the rules outlined above.
- Deals less than $10,000 are not eligible for Partner Commissions or Partner Credits. Temporary upsizes are also not eligible.
- Partner commission and credit amounts are capped at $50,000 USD on a per deal basis.
- Partner Commissions and Partner Credits shall be calculated as a percentage of the net sales price of the subscription service ***for the initial annual subscription value only***.

PRSMF, ¶15, Third paragraph (emphasis added to italicized and bolded portions).

*Fifth*, as explained above, Photon never agreed to the changes set forth in the July 2018 "Acquia Partner Program & Partner Rewards" document.

Accordingly, Photon is entitled to (i) an additional 10% commission on the initial $345,000 Mars deal and (ii) additional 15% commissions for each renewal.

## IV.   PHOTON IS ENTITLED TO ADDITIONAL BAYER COMMISSIONS

Photon referred and co-sold a Bayer website replatforming opportunity with add-on products to Acquia, which Bayer renewed several times for millions of dollars. PSAMF, ¶40. Acquia failed to pay Photon any commissions for Bayer. PRSMF, ¶17.

### a.   Photon Is Entitled To A 5% Referral Commission

Acquia incorrectly claims that Photon did not refer Bayer to Acquia. The BPRA provided that "Acquia will notify [Photon] of Acquia's acceptance or rejection of a Lead within seven (7) business days from its receipt of the Deal Registration Form." BPRA, Section 5. Acquia routinely failed to send Photon confirmations or rejections of registered Leads, and Photon would not receive a confirmation unless someone from Acquia remembered and decided to

19

forward an *internal* Acquia email about the deal registration. PRSMF, ¶12. Regarding Bayer specifically, Photon referred Bayer to Acquia and Acquia failed to send a confirmation or rejection to Photon. PRSMF, ¶16.

### b. <u>Photon Is Entitled To A 5% Co-Selling Commission</u>

Acquia incorrectly claims that Photon did not co-sell Bayer to Acquia. Acquia's internal opportunity tracking system literally lists Photon as "Partner Co-Sell #1" for Bayer. PRSMF, ¶17 (citing Acquia000784). In a February 9, 2018 email from Acquia's Paul Treichler to Photon personnel about his upcoming departure from Acquia, he wrote, "It's been a pleasure working with you over the last 6 months on projects like Walgreens, L'Oreal, ***Bayer***, and others." *Id*. (citing P020481) (emphasis added). Acquia also acknowledged in an internal email that Photon was involved in the co-selling process, but nevertheless attempted to remove that co-sell designation *after* Acquia closed the Bayer deal. *Id*. (citing Acquia email, dated April 24, 2018).

### c. <u>Photon is Entitled to a 5% Bonus Commission</u>

Because Photon referred and co-sold Bayer to Acquia, Photon is entitled to a 5% bonus commission pursuant to Section 6 of the BPRA.

### d. <u>Photon is Entitled to Renewal Commissions</u>

For the same reasons Photon is entitled to commissions on the Mars renewals, it is entitled to commissions on all Bayer renewals.

### v. <u>Conclusion</u>

For these reasons, Photon respectfully requests that the Court deny Acquia's motion.

Respectfully submitted,

NORTH AMERICA PHOTON
INFOTECH, LTD.

*/s/ Ian J. Pinta*
Ian J. Pinta (BBO # 667812)
Christian G. Kiely (BBO # 684308)
TODD & WELD LLP
One Federal Street, 27th Floor
Boston, MA 02110
(617) 720-2626
ipinta@toddweld.com
ckiely@toddweld.com

Erin P. Severini
FROST BROWN TODD LLP
301 East Fourth Street, Suite 3300
Cincinnati, OH 45202
Telephone: (513) 651-6415
Facsimile: (513) 651-6981
eseverini@fbtlaw.com

Samuel E. Joyner (admitted pro hac vice)
FROST BROWN TODD LLP
2101 Cedar Springs Road, Suite 900
Dallas, TX 75201
Telephone: (214) 545-3472
Facsimile: (214) 545-3473
sjoyner@fbtlaw.com

Dated: November 13, 2024

## CERTIFICATE OF SERVICE

In accordance with Federal Rule of Civil Procedure 5 and Local Rule 7.1(c), I hereby certify that on November 13, 2024, I caused the foregoing to be electronically filed with the Clerk of the Court using the CM/ECF system, which will send notice of electronic filing to all counsel or record registered with the Court's CM/ECF system.

*/s/ Ian Pinta*
Ian J. Pinta