UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS


_____

NORTH AMERICA PHOTON INFOTECH, LTD.,

                    Plaintiff,        Civil Action
                                      No. 22-12052-FDS
V.
                                      November 26, 2024
ACQUIA INC.,                          2:00 p.m.

                    Defendant.
_____



TRANSCRIPT OF MOTION HEARING VIA VIDEO CONFERENCE

BEFORE THE HONORABLE F. DENNIS SAYLOR, IV

UNITED STATES DISTRICT COURT

JOHN J. MOAKLEY U.S. COURTHOUSE

1 COURTHOUSE WAY

BOSTON, MA  02210




DEBRA M. KANE, RMR, CRR, FCRR
Official Court Reporter
John J. Moakley U.S. Courthouse
1 Courthouse Way, Room 5204
Boston, MA  02210
debrakane0711@gmail.com

```
1     APPEARANCES:

2     FOR THE PLAINTIFF:

3     IAN J. PINTA, ESQ.
      Todd & Weld
4     One Federal Street
      27th Floor
5     Boston, MA 02110
      617-720-2626
6     ipinta@toddweld.com

7     FOR THE DEFENDANT:

8     IRWIN B. SCHWARTZ, ESQ.
      VLADAMIR EGIYAN, ESQ.
9     BLA Schwartz, PC
      Suite 302 B
10    One University Avenue
      Westwood, MA 02090
11    781-636-5032
      ischwartz@blaschwartz.com
12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1                    P R O C E E D I N G S

2                    (The following proceedings were held via

3       videoconference before the Honorable F. Dennis Saylor, IV,

4       United States District Judge, United States District Court,

5       District of Massachusetts, at the John J. Moakley United States

6       Courthouse, 1 Courthouse Way, Boston, Massachusetts, on

7       November 26, 2024.)

8                    THE CLERK:  Court is now in session in the matter of

9       North American Photon Infotech, Ltd. v. Acquia, Inc., civil

10      action 22-12052.

11                   Participants are reminded that photographing,

12      recording and rebroadcasting of this hearing is prohibited and

13      may result in sanctions.

14                   Would counsel please identify themselves for the

15      record, starting with the plaintiff.

16                   MR. PINTA:  Good afternoon, your Honor.  Ian Pinta on

17      behalf of plaintiff, North American Photon Infotech.

18                   MR. SCHWARTZ:  Good afternoon, your Honor.  Irwin

19      Schwartz, and with me is Vladimir Egiyan, an associate with our

20      firm; and we are here for Acquia, Inc., defendant and moving

21      party.

22                   THE COURT:  All right, good afternoon.

23                   All right.  This is a hearing on defendant's motion

24      for summary judgment.  I've read the briefs, which are quite

25      thorough and well done, but I will give counsel an opportunity

1    to summarize and highlight that and add whatever you want to

2    add.

3         I will alert you, I'm on a very tight schedule today.

4    I'm wrapping up a very lengthy, month-long trial, and so I have

5    half an hour.  So I'm going to give 15 minutes per side, so

6    pick your words carefully.  And again, it's quite thoroughly

7    briefed.

8         But, Mr. Schwartz, it's your motion, I'll start with

9    you.

02:02 10        MR. SCHWARTZ:  Thank you, your Honor, and I will

11    endeavor to take less than 15 minutes.

12         THE COURT:  Okay.

13         MR. SCHWARTZ:  So I would first note for the Court, as

14    you probably have already divined from the papers that neither

15    party is taking the position that the contract and the

16    potential documents incorporated by reference are ambiguous.

17    This is not a case where a party is asserting the contracts are

18    ambiguous; therefore, we believe it's appropriate for

19    resolution on summary judgment.

02:03 20        I also note that Photon offered no evidence that

21    Acquia violated the covenant of good faith and fair dealing or

22    abused its discretion in this case.  It's really about did the

23    parties comply with the contract and what the contracts

24    actually say.

25         At bottom, Photon's case turns on a snippet of

1    language in paragraph 6 of the parties' agreement that expands

2    on the effort necessary to obtain a 15 percent, effectively,

3    commission; it's referral fees here.  And Photon argues that

4    that snippet contains all the material terms necessary for the

5    Court to resolve this case.

6           First, I would note for the Court that that snippet,

7    if you read it in the context of the entire paragraph, is

8    actually attempting to clarify language that's in what is

9    attached to Exhibit C to Ms. Shenberger's declaration, which is

02:04 10   the terms for referral fees that our client, Acquia, attempted

11   to incorporate by reference in the contract.

12          There's not much doubt that Photon was aware that

13   there -- in fact, there is no doubt that Photon was aware that

14   the contract attempted to interpret -- to include those

15   reference terms because the email track before the contract was

16   signed, which is Exhibit D to Ms. Shenberger's declaration, and

17   Exhibit E to her declaration show that Photon was actually

18   asking how to get a copy of this document.  And Ms. Shenberger

19   responded by saying, hey, look, if you take the URL and cut and

02:04 20   paste it into your browser, it will come up for you.

21          No response, 12 hours later the contract is signed.

22          There is no way that Photon can take the position that

23   it was unaware of those terms.  And yet, Photon asks the Court

24   to ignore those terms.

25          Photon's case turns on the premise that those terms

1    don't apply to it.  We cited a case called <u>Powershare</u>, and at

2    page 16 of that, the 1st Circuit is saying you can't -- you

3    shouldn't interpret contracts to make terms meaningless.  And

4    yet, that's exactly what Photon is requesting this Court do

5    with respect to the language that incorporates those terms by

6    reference.

7         And then the other thing that there's no evidence in

8    this summary judgment motion is that there was some document

9    other than Exhibit C to Ms. Shenberger's declaration that was

02:05 10  really what was incorporated by reference.  She says

11    affirmatively this is what it is.  Photon points out that in

12    her deposition testimony she hedged a little bit and said, I'm

13    not a hundred percent sure, I think it is.  But that doesn't

14    mean that Exhibit C is not what was attached or provided in

15    that link.  And accordingly, we believe the Court should be

16    able to find that Exhibit C was incorporated by reference and

17    its terms do apply to these parties' relationship.

18         Another point that is -- by the reply papers and

19    sur-reply is disputed as to whether or not Acquia exercised its

02:06 20  discretion to downgrade Photon's partnership level in this

21    commission scheme.  And in respect for Court's time, I don't

22    want to go into a long background of how this stuff works, but

23    suffice to say that there were multiple levels.  The contract

24    itself says that Photon will commence this relationship at the

25    Preferred level, which is a relatively high tier, but that if

1    Photon doesn't meet certain certification requirements, getting

2    its engineers certified to install and use Acquia products,

3    that it can be downgraded.

4         There's no dispute that it didn't meet those

5    standards, and Ms. Shenberger put in her declaration that, in

6    fact, it was downgraded to what originally was called the

7    Community level and then called the Foundation level partner.

8    It's the entry-level partnership.

9         I'm sorry, my lights just clicked off due to power

02:07 10    saving.

11         And the only opposition to that is that they say,

12    well, they didn't receive notice.  Although, as she points out

13    in her sur-reply declaration, notice is provided through the

14    portal.

15         And then there is a statement that says that Photon

16    was continuously treated as a Preferred partner throughout the

17    time.

18         But if your Honor looks into the material that's in

19    the statement of material facts, the Rule 56.1 opposition, none

02:07 20    of the evidence they cite to for that proposition actually

21    holds that proposition.  They have people saying, I don't

22    remember getting notice; and they have people saying, Well, if

23    we had gotten notice -- if they had downgraded us, we probably

24    would have got less money.  But there's nobody who says they

25    weren't downgraded.  And in fact, the evidence that comes out

1   of Acquia's file shows that when they landed their next

2   customer, which was Mars, which is a big dispute in this case

3   over them, they're treated as being a Foundation level partner.

4   They're treated as being the lower-level partner.

5           So while they -- and I would suggest that a thorough

6   reading of paragraph 13 of Photon's Rule 56.1 statement will

7   yield to the Court that outcome.

8           In particular, I'd ask the Court to pay attention to

9   Exhibit I of the Pinta declaration, which is an email in which

02:08 10   Photon asserts that it demonstrates that Photon was a Preferred

11   level partner throughout this time frame.

12           What that email says -- and if you look at the dates

13   of the various communications going back and forth, there was a

14   question in 2017 as to what Photon's level was.  And Molly

15   Shenberger in response said Photon was paid as a Preferred

16   level partner for a deal brought in in 2015.

17           Then, in 2019, there's another email that comes back

18   that says, Well, in 2017 we're talking about 15 percent, and

19   therefore, we must have been 15 percent the whole time.  But it

02:09 20   doesn't take account of the years between 2015 and 2019 where

21   the evidence is undisputed that Photon was actually a

22   Foundation level partner.

23           The significance of that, your Honor, is if you come

24   to the next issue in this case, which is was Acquia able to

25   amend the terms of the referral fee, the Referral Fee Terms,

1    the contract expressly gives Acquia the discretion to amend

2    them.  And it says amendments will be done by notice through

3    the portal.

4            We know that Photon received notice because they

5    produced copies out of their files of the amended terms.  And

6    the significance of the amended term, your Honor, is that it

7    limits Foundation partners to only 5 percent of referral fee,

8    whereas Preferred partners were getting 15 percent.

9            So the argument that Photon asserts is that it never

02:10 10   agreed to those amended terms.  It also says it never received

11   them, but it's hard for them to say that when it comes out of

12   their own file.

13           Your Honor, the contract gives Acquia the discretion

14   to amend those terms.  It doesn't require agreement to amend

15   those terms.  And that -- and what Photon is asking your Honor

16   to do is to ignore that discretion language and hold that

17   Acquia could not amend the terms without Photon's express

18   written consent, which does apply to the remainder of the

19   terms.  The contract does say it can only be amended with

02:11 20   express written consent.  But if you apply that language, the

21   discretion, you're basically eviscerating the discretion

22   language.

23           So we would suggest, your Honor that, the 2018 terms

24   are applicable to the parties' relationship in 2018, which

25   covers the Mars deal, and means that Photon was only entitled

1 to 5 percent, which is what they got paid.  There is an

2 internal Acquia document in the file that actually shows the

3 calculation of that.

4    However, it's also undisputed that Acquia then

5 elevated Photon's terms -- Photon's level to Preferred level

6 after the Mars deal.  And there's language in the contract that

7 says that Acquia had the discretion to do that, and the

8 internal documents show that Acquia did it.

9    When Photon resold an upgrade for that Mars contract,

02:12 10 they got paid 15 percent, applicable to the Foundation level

11 terms.

12    So, we'd suggest, your Honor, that there is -- Acquia

13 was just exercising its right.  And the fact that Photon got

14 paid 15 percent in 2015 and the fact that they got paid 15

15 percent in 2019 does not prevent Acquia from exercising its

16 right to have them as a Foundation level partner in the

17 intervening years of '16, '17 and most of '18, as

18 Ms. Shenberger says in her declaration.

19    Another issue, your Honor, that has come up from

02:12 20 Photon is whether or not the contract limited them to getting

21 referral fees on only the initial introduction of a client or,

22 I guess, indefinitely.  They don't quite define when the 15

23 percent would stop getting paid.  But their suggestion is that

24 these terms would apply indefinitely, regardless of whether

25 they assisted in co-selling, doing the other things necessary

1    on later deals, on renewals.

2         The 2018 terms expressly say you only get paid on the

3    initial introduction.

4         If your Honor looks closely at the 2015 terms, which

5    are Exhibit C to Ms. Shenberger's declaration, you will see

6    that the language in there also speaks of the initial -- it

7    talks about sourcing at the expected date of decision,

8    singular, post selling is singular.  So in the language of it,

9    although it's not explicit that you only get paid on the first

02:13 10    deal, the actual language explaining how you get paid, what is

11    necessary is all referring to a single deal-by-deal basis.  And

12    on that basis we'd suggest that Photon was only entitled to the

13    first deal with Mars, which they did get paid on.

14         And I would note one last point, your Honor.  There is

15    nothing in the record anywhere that says that Photon does get

16    paid on renewals.  There is some language relating to a

17    different part of the program that Photon was not a part of

18    that says that Acquia will pay on renewals under certain

19    circumstances.  But there's not a single email, there's not a

02:14 20    single piece of contractual language, there's nothing that says

21    they can get paid on renewals other than Photon's

22    interpretation of that one part of a clause in paragraph 6.

23         Finally, your Honor -- and I hope I'm not over 15

24    minutes yet --

25         THE COURT:  Almost, not quite.

1          MR. SCHWARTZ:  -- I just want to talk about Bayer.

2     Photon contends that it's entitled to a 15 percent on Bayer

3     revenue.  The record shows that -- well, there's nothing in the

4     record to show that Photon actually registered Bayer.  That's

5     part of the process.  You need, actually, to submit a

6     registration process, it needs to get approved, whatnot.

7     Photon's response is, well, your system didn't really work

8     right, so, you know, that explains it.  It doesn't explain it,

9     your Honor.

02:15 10          The process, as these documents reflect, and even the

11     little snippet that Photon relies on, talks about Photon having

12     a duty to introduce and other things.  And there's nothing in

13     the record to show that they did that for Bayer.  There's no

14     internal documents, no communications with Bayer, no

15     communications with Acquia that show that Photon was actually

16     doing that.

17          And the final point I'd point to your Honor, and I

18     know we referenced this in our brief, is that when you look at

19     the email that Photon appears to rely on to say that it did

02:15 20     register Bayer, it says it registered Bayer in 2019.  The Bayer

21     deal that they're seeking to get paid on is 2018.

22          So even if they did try to register Bayer, which we

23     don't think they did, and Ms. Shenberger said she did an

24     investigation and could find no evidence of it, they didn't

25     meet the requirements of registering before the deal was done.

1          There's other reasons why Bayer doesn't apply, your

2    Honor, but I think with respect to the Court's time, it's there

3    in our brief.

4          So, with that, your Honor, I just say that is an

5    interpretive case for the Court.  We think summary judgment is

6    appropriate given the lack of evidence creating material issues

7    in dispute, and we'd ask the Court to dismiss the compliant.

8          THE COURT:  Thank you.

9          All right.  Mr. Pinta.

02:16 10        MR. PINTA:  Thank you, your Honor.

11          As can be seen in our responses to Acquia's statement

12    of facts, there are substantial disputed facts on multiple

13    different issues that are important in this case.

14          I think it's important to start off -- I'm not going

15    to belabor the standard, I know you know the standard, but this

16    agreement, the referral agreement, did attempt to incorporate

17    two embedded links.  And one link, including the first

18    paragraph, is the Program Terms; the other link, the Referral

19    Fee Terms, is in paragraph 6.  These are very different terms.

02:16 20        The Program Terms, which is purportedly Exhibit B to

21    Ms. Shenberger's declaration, is generally just a marketing

22    document that list the different types of partners.  At that

23    point it was Community, Global Select, and something else.

24          And the agreement in paragraph 1 says that the Program

25    Terms, capital P, capital T, can be changed by Acquia at their

 1   own discretion.

 2          The Referral Fee Terms, capital R, capital F, capital

 3   T, is an entirely separate provision that lays out in detail

 4   how to calculate these commissions:  5 percent for referring, 5

 5   percent for influencing or co-selling, and a 5 percent bonus

 6   for doing both.  And the Referral Fee Terms, capital R, capital

 7   F, capital T, is not the Program Terms.  And the Referral Fee

 8   Terms cannot be amended unless Photon agrees to it per Section

 9   15 of the agreement.  And so the Referral Fee Terms are the

02:17  10   important terms in this litigation.

11          And the paragraph 6 or Section 6 in the referral

12   agreement was specifically negotiated by the parties and

13   specifically said that Photon is entitled to 15 percent for

14   referring, co-selling, and the bonus for doing both.  That is

15   what governs this case, because the purported documents on the

16   other side of those links do not exist.

17          We have -- let's start with the first program's terms

18   document that Acquia says is that document, Exhibit B to

19   Ms. Shenberger's affidavit or declaration.

02:18  20          She said in her deposition, quote, I'm not saying it's

21   not, I'm saying that I'm not certain that it is.

22          So she can't even determine whether or not that is the

23   same file.  And the document file name that she says is that

24   PDF is different than the PDF file name in the link in the

25   agreement itself.  So there's a dispute on that.

1          You may ask yourself why can I not figure out if this

2    is the actual document?  They didn't save the document.  The

3    link is no longer active, and they didn't save it on their

4    internal Sales Force.

5          We move on to the purported Referral Fee Terms

6    document.  This doesn't apply because it never worked.  There

7    was an email on August 11, 2015 from a Photon representative to

8    Acquia saying, I clicked on the link, it doesn't work.

9          Then you go to the affidavit or declaration that we

02:19 10    submitted by Sanjiv Lochan, who was responsible for reviewing

11    the agreements before Photon signing them, and he says --

12    declares under oath that he reviewed the agreement and all

13    links are accessible and there was nothing in there, and he

14    didn't see any -- let me back up a second.

15          So that 2015 Referral Fee Terms Agreement purportedly

16    has a cap on commissions of $100,000.  And Mr. Lochan testifies

17    that he reviewed everything and he never saw anything about a

18    cap and he never would have agreed to sign anything that

19    included a cap.  And so that either expressly or implicitly

02:20 20    with all reasonable inferences could be drawn in Photon's favor

21    indicates that that purported document was not there.

22          We also have testimony from Acquia saying that they

23    don't even know if Photon was able to access that link.  At

24    best, this is a disputed issue of fact for the jury to decide.

25          We move on to the July 2018 amendment, which Acquia

1    hangs their hat for this case.  That July 2018 document

2    attempted to amend both the Program Terms and the Referral Fee

3    Terms.

4         Acquia can amend on its own discretion the Program

5    Terms but not the Referral Fee Terms without Photon's consent.

6    And these changes made to the Referral Fee Terms were

7    substantial.  For the first time they said that fees were only

8    available on the first year subscriptions.  That was nowhere in

9    the agreement before then.  They tried to cap commissions at

02:21 10    $50,000 a deal for the first time.  They tried to cap

11    commissions at 10 percent, so they deleted the bonus.  They

12    capped Foundation partners at 5 percent.

13         This was never agreed to by Photon.  And what Acquia

14    says, Well, no, we don't need their agreement, we can do this

15    on our own.  And as Mr. Schwartz even said today, those are the

16    Program Terms.  Those are not the Program Terms, those are

17    Referral Fee Terms.  That is a separate and distinct provision

18    of the agreement with a separate and distinct document.

19         And even Acquia's Molly Shenberger testified at

02:22 20    length, and we quoted her testimony, she believed and Acquia

21    believed that the Referral Fee Terms were the Program Terms,

22    and that is not the case.

23         They also say that, Well, we let Photon know about it,

24    we sent an email blast.  There was no email.  There's testimony

25    from Photon in a number of places saying that they never

1    received the email -- and it's not even an actual email,

2    there's no date, there's no year on this email upon which

3    Acquia relies.  And even Acquia's Molly Shenberger testified

4    that she could not confirm whether or not Photon received this

5    purported email.  Even if the email was sent, it doesn't matter

6    because Photon had to agree to it and they never did.

7         In terms of the deal registrations, I mean, there's no

8    dispute that Photon referred Mars.  But with regards to Bayer,

9    this is important, because this was not a great portal to

02:23 10    register deals.  It's not a situation where you send an email

11    to Acquia, they say yes or no.  And the agreement says that

12    Acquia has to respond, to accept it or reject it, within seven

13    days.  There's not an email, no email traffic, it's all done in

14    the portal.  And there's testimony and evidence, as we

15    indicated in our statement of facts, that when a deal was

16    registered on the portal, you login and you register on the

17    portal, an internal email is spit out on your side.  It doesn't

18    come back to Photon.  And the only times that Photon would

19    receive confirmation about a deal is when a member of Acquia

02:23 20    would forward that internal notification to Photon.  That's why

21    we don't have it.  It was incumbent on Acquia to do it.

22         With regards to the change in partnership level, this

23    is a hotly disputed issue.  There is multiple pieces of

24    evidence cited in our statement of facts that even though

25    Photon my not have gotten all the engineers certified, they

1   were never notified that they were downgraded from a Preferred

2   to Foundation level partner.  They were actually never notified

3   that they were purportedly elevated from a Foundation partner

4   to Preferred partner.  The first time that we learned that

5   there was some elevation was a few days ago when we got this

6   affidavit from Ms. Shenberger.  That was the first we ever

7   heard of that.  And there is a litany of evidence that we were

8   never informed of that change, and the agreement simply says

9   that unless and until that change is communicated to the

02:24 10   partner, the prior commission calculations govern.  At a

11   minimum, that's disputed.

12        With regards to the specific deals, there's no dispute

13   that Photon referred Mars.  The issue is whether or not -- one

14   of the issues is whether or not they also -- Photon also gets

15   an influence fee.  In Acquia's internal document management

16   system it says that Photon co-sold and influenced this fee --

17   this deal.  But they claim that Photon's not entitled to the

18   extra 10 percent -- 5 percent for co-selling and 5 percent

19   bonus -- because it was a Foundation level partner pursuant to

02:25 20   the 2018 amendments.  We dispute that there was ever a

21   downgrade to Foundation, and we dispute that the 2018

22   amendments ever applied to Photon.

23        I think it's important, too, that those two Mars

24   portions, there's a Mars add-on product for which Photon was

25   paid 15 percent as a Preferred partner, and the most recent

affidavit from Ms. Shenberger says that, Well, that's because

in March of 2019 they were elevated back to Preferred partner

and that's why they got the 15 percent.  She says that happened

in March of 2019.  That add-on product for which there's no

dispute that Photon received 15 percent closed almost six

months earlier on September 27, 2018, and that's in Acquia's

motion.  It closed in September of 2018.  So how could it

receive 15 percent in September of 2018 if it wasn't a

Preferred partner and if the July 2018 amendments didn't apply.

At a minimum, that is a disputed issue of fact.

        With regards to renewals, and this applies to both

Bayer and Mars, the first time renewals -- the first time

Acquia ever said that renewals were not eligible for

commissions was in that 2018 amendment.  There's nothing in the

2015 document, and in fact, in the referral agreement itself it

says that you can get influence fees, co-selling fees, for

renewals.  And this in Section 7, and I'll read it, it's

important.

        It says, Influenced fees are not issued for customer

subscription renewals unless partner has met or exceeded its

minimal referrals set forth in the Program Terms.

        So that indicates that, yes, influence fees were

available at a minimum for renewals.  And there's nothing in

the agreement itself or in the 2015 document that says renewals

are not allowed.  The first time that pops up is in 2018 in the

1    2018 amendments that were never agreed to by Photon.

2         With regards to Bayer, there's absolutely a disputed

3    issue as to whether or not Bayer was referred by Photon.

4    There's substantial testimony saying that the website platform

5    was referred by Photon.  And I think it's also important to

6    note that it's not just the referral fee that Photon is looking

7    for from Bayer, it's the co-selling fee as well.  And there's

8    no dispute that Photon co-sold that opportunity.  It's listed

9    directly and expressly in Acquia's internal document management

02:28 10    system.  And they don't contest anywhere in their briefing, in

11    their papers that Photon was not entitled to a co-sell fee for

12    Bayer.

13         With that, your Honor, I'll rest on my papers.  Happy

14    to answer any questions you may have.

15         THE COURT:  All right, thank you.

16         I'm going to have to cut it short.

17         Thank you.  It's well argued.  Have a happy

18    Thanksgiving all, and I will take this under advisement.

19         (Court adjourned at 2:28 p.m.)

20              - - - - - - - - - - - -

21

22

23

24

25

1                              CERTIFICATION

2            I certify that the foregoing is a correct transcript

3    of the record of proceedings in the above-entitled matter to

4    the best of my skill and ability.

5

6

7

8    /s/Debra M. Kane                       December 23, 2024
     Debra M. Kane, RMR, CRR, FCRR          Date
9    Official Court Reporter

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25