# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

_____
                                                    )
**NORTH AMERICA PHOTON**                            )
**INFOTECH, LTD.,**                                 )
                                                    )
      **Plaintiff,**   )
                                                    )      **Civil Action No.**
     **v.**                  )      **22-12052-FDS**
                                                    )
**ACQUIA, INC.,**                                   )
                                                    )
      **Defendant.**   )
_____)


## MEMORANDUM AND ORDER ON
## DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

**SAYLOR, J.**

Plaintiff North America Photon Infotech, Ltd., brought this action seeking monetary relief against defendant Acquia, Inc. The complaint alleges that defendant breached a contract setting forth the terms of a client-referral agreement between the parties, resulting in approximately $1.6 million of unpaid compensation due to plaintiff. The complaint alleges two common-law causes of action: (1) breach of contract and (2) breach of the implied covenant of good faith and fair dealing. Jurisdiction is based on diversity of citizenship.

Defendant subsequently moved for summary judgment, asserting that the undisputed evidence demonstrates that it paid plaintiff all the fees that it was due under the terms of their agreement. In response, plaintiff contends that defendant impermissibly attempted to change the terms of the agreement, and failed to compensate it in accordance with the initially agreed-upon terms.

For the following reasons, the motion will be granted in part and denied in part.

I.    **Background**

The following facts are undisputed unless otherwise noted.

A.    **Factual Background**

1.    **Parties**

North America Photon Infotech, Ltd., ("Photon") is a Mauritius private limited company with a principal place of business in Quatre Bornes, Mauritius.  (Def.'s Stmt. Undisp. Mat. Facts ["Def.'s SMF"] ¶ 2).  Photon is a digital agency that designs, develops, and supports "digital experiences."  (*Id.*).

Acquia, Inc., is a Delaware corporation with a principal place of business in Massachusetts.  (*Id.* ¶ 1).  It is a software-development company that sells products related to cloud platforms built around an open-source web-content-management framework known as "Drupel."  (*Id.*).

2.    **The Initial Partner Referral Agreement**

To expand its sales, Acquia sought to acquire new customers through partnerships with companies that would refer their clients to it.  (Shenberger Decl. Ex. B).  Photon entered one such partnership with Acquia.  (Shenberger Decl. ¶ 2).

On August 12, 2015, the parties executed an agreement—known as the Acquia Business Partner Referral Agreement ("BPRA")—governing the terms of the referral partnership.  (*Id.*).  Under the agreement, Acquia agreed to pay Photon a referral fee for each "Qualified Lead" that purchased a web-subscription product from it.  (Shenberger Decl. Ex. A ¶¶ 5-6).

Section 5 of the agreement defines a Qualified Lead as a customer (1) to which Photon promoted Acquia's products, (2) that Photon registered through a deal-registration form on Acquia's designated web portal, and (3) that Acquia formally accepted as a prospective business partner.  (*Id.* ¶ 5).  Acquia was to provide Photon notice of formal acceptance or rejection within

2

seven days of the submission of the deal-registration form.  (*Id.*).  The BPRA permitted Acquia

to reject a customer for multiple reasons, including if it had already engaged the customer or had

previously been aware of the opportunity.  (*Id.*).

For each Qualified Lead that purchased Acquia's products, Acquia would pay Photon a

referral fee.  (*Id.* ¶ 6).  The terms of the referral fees are set forth in section 6 of the agreement,

which includes the following language:

> For each Qualified Lead that purchases Acquia Products, Acquia will pay to
> [Photon] the applicable referral fee ("Referral Fee") set forth in the Referral[-]Fee
> Terms located here:
> https://partners.acquia.com/sites/default/files/library/attachment/acquia_partner_r
> ewards_2015.pdf
>
> For the avoidance of doubt, in order for [Photon] to receive the source, co-sell and
> bonus Referral Fees totaling 15% set forth at the link above, [Photon] must meet
> the following nonexhaustive, minimum criteria:
>
> - Make introductions of Acquia to key stakeholders
> - Help to set up meetings (in person or over the phone)
> - Provide light qualification information – Budget, Authority, Need and
>   Timeline

(*Id.*).

The parties dispute whether Photon ever gained access to the Referral-Fee Terms

hyperlink referenced in section 6.  As a consequence, the parties dispute the contents of the

linked document.  Acquia asserts that the link connects to a document ("2015 Referral-Fee

Terms") that details the terms and structure of the program's referral fees.  (*See* Shenberger Decl.

Ex. C).  According to that document, a partner such as Photon could earn a commission of up to

15 percent of the value of the sale to a Qualified Lead.  (*Id.*).  That commission would consist of

(1) a 5 percent fee for sourcing the deal by successfully identifying and qualifying a potential

customer; (2) a 5 percent fee for co-selling the deal by actively participating in the sale of

Acquia's products; and (3) a 5 percent bonus, contingent on the completion of the prior two

steps.  (*Id.*).  The sourcing and co-selling fees could be earned separately—that is, Photon could register an opportunity as a sourcing partner or as a co-selling partner (or both), and collect the corresponding 5 percent fee.[1]  The 2015 Referral-Fee Terms further state that a $150,000 referral-fee cap applies for each sale to a Qualified Lead, with a $50,000 cap on each 5 percent sub-component of the fee.  (*Id.*).

On July 29, 2015, Molly Shenberger, the Senior Director of Global Channels at Acquia who oversees the company's partnership programs, emailed a Photon representative, Vijay Iyer, the hyperlink from the BPRA to access the 2015 Referral-Fee Terms.  (Shenberger Decl. ¶ 4, Ex. D).[2]  Apparently, Photon had trouble immediately accessing the document; another Photon representative, Siddharth Pratyush, replied to Shenberger's email to inform her that the "link under the referral [-]fee section still [did not] work."  (Shenberger Decl. Ex. E).  Shenberger responded that she checked the link and that it would work if he "cop[ied] and paste[d] it into [a] browser."  (*See* Shenberger Decl. ¶ 4, Ex. E).

It is undisputed that twelve hours after receiving Shenberger's email, Photon executed the BPRA and returned it to Acquia with no objections.  (Shenberger Decl. ¶ 5; *see* Shenberger Decl. Ex. E).

---

[1] For example, Photon could co-sell Acquia's products to a Qualified Lead that had been sourced by a different partner and earn a 5 percent referral fee for its participation in that deal.  (Shenberger Decl. Ex. C). Conversely, Photon could earn a 5 percent fee by sourcing a deal then transferring the opportunity to another partner to co-sell Acquia's products.  (Shenberger Decl. Ex. C).

[2] Shenberger also included a separate hyperlink connected to a document defined as "Program Terms" in the opening sentence of the BPRA.  (Shenberger Decl. Ex. D).  The Program Terms document, attached as Exhibit B to Shenberger's declaration, contains marketing materials and a general overview of the partner referral program. (Shenberger Decl. Ex. B).  But as Shenberger stated in her deposition, it "does[ not] go into great detail about commission calculations."  (Pinta Decl. Ex. B).  Plaintiff maintains that it could not access the Program Terms hyperlink or the 2015 Referral-Fee Terms hyperlink.

Starting in August 2015, Photon began registering potential customers by submitting deal-registration forms through the designated web portal.  (Shenberger Decl. ¶ 10).  Some of those leads were rejected by Acquia while others were accepted as Qualified Leads.

### 3.    Photon's Partnership Status

Under section 2 of the BPRA, Photon was appointed to be a "preferred partner," which, at the time of the BPRA's execution, made it eligible to receive certain benefits from Acquia, such as onsite sales training and marketing-development funds.  (Shenberger Decl. Ex. A ¶ 2, Ex. B).  At that time, its "preferred partner" status did not affect its ability to earn referral fees. (Shenberger Decl. Ex. B, Ex. C).

Photon's preferred-partner status was contingent upon it successfully certifying six of its engineers with Acquia by December 31, 2015.  (Shenberger Decl. Ex. A ¶ 2).  The BPRA states that

> Acquia reserves the right, in its sole discretion, to downgrade [Photon's] partner level if [Photon] fails to satisfy the certification requirements set forth above. . . . Acquia also reserves the right, in its sole discretion, to upgrade [Photon] to a higher partner level.  All changes to a partner level will be communicated to [Photon].

(Shenberger Decl. Ex. A ¶ 2).

It is undisputed that Photon failed to certify six engineers by December 31, 2015. (Shenberger Decl. ¶ 7).  However, the parties dispute whether Acquia, in fact, exercised its discretion to reduce Photon's partnership status from "preferred partner" to that of "foundation partner."[3]  Acquia asserts that it reduced Photon to foundation-partner status effective January 1, 2016, and that Photon remained a foundation partner throughout 2016, 2017, and most of 2018.

---

[3] At the time of the BPRA's execution, the reduced partnership tier was called "community," but was later changed to "foundation."  (*See* Shenberger Decl. Ex. B).  Both parties use the foundation-partner nomenclature to refer to the reduced partnership tier.  The Court therefore adopts the parties' naming convention.

(*Id.*).  However, Photon contends that Acquia never reduced its partnership status because (1) it never communicated to it that Acquia made such a change, as required under the BPRA, and (2) Acquia continued to treat it as a preferred partner well after the December 2015 deadline.  (Pinta Decl. Ex. C, Ex. Q).

### 4.     2018 Revisions to the Referral-Fee Terms

In January 2018, Acquia sought to revise the terms and calculation of the referral fees.  (Shenberger Decl. ¶ 8).  Acquia justified its attempt to revise the 2015 Referral-Fee Terms under the language of section 1 of the BPRA, which provides in relevant part that "Program Terms are subject to change and/or discontinuance by Acquia upon thirty (30) days['] notice to [Photon] via Acquia's Business Partner Portal."  (Shenberger Decl. ¶ 8; *see* Shenberger Decl. Ex. A ¶ 1). Acquia maintains that it sent an email to each of its partners, including Photon, notifying them of the changes in terms.  (*Id.*).  Photon disputes receiving that email.  (Pinta Decl. Ex. E, Ex. F).

The revised terms are detailed in a document attached as Exhibit G to Shenberger's declaration ("2018 Revised Terms").  (Shenberger Decl. ¶ 8; *see* Shenberger Decl. Ex. G). Among other things, the 2018 Revised Terms document instituted a 5 percent cap on the total commissions that foundation-level partners could earn per deal, regardless of their level of involvement, with a maximum payment of $50,000 per deal.  (Shenberger Decl. ¶ 9).  In addition, the 2018 revisions specified that partners were prohibited from earning referral fees on renewals of previously sourced or co-sold products.  (*Id.*).

Photon disputes the applicability of section 1 to Acquia's authority to revise the referral-fee terms.  It asserts that section 15 of the BPRA instead governs Acquia's ability to make such revisions.  Section 15 states in relevant part that "[t]he Agreement and all of its provisions may not be amended or waived unless agreed upon in writing signed by the parties hereto." (Shenberger Decl. Ex. A ¶ 15).  The term "Agreement" is defined as the entire BPRA contract.

(Shenberger Decl. Ex. A).  There is no dispute that Photon did not provide its written consent to the 2018 Revised Terms.

### 5.     Mars Transaction

On August 18, 2018, Photon registered a potential lead with Mars Information Services, Inc. through Acquia's designated deal-registration web portal.  (Shenberger Decl. ¶ 11).  Acquia then confirmed the registration as a Qualified Lead and sold $345,000 of its products to Mars. (*Id.*).  Based on Acquia's understanding at the time that (1) the 2018 Revised Terms governed the referral-fee calculation and (2) Photon was a foundation-level partner, Acquia paid Photon a 5 percent referral fee of $17,250 for the Mars sale.  (*Id.*).[4]

After the initial transaction, Mars renewed its subscription multiple times.  (*Id.*). However, Acquia did not pay Photon any referral fees in connection with those renewals.  (*Id.*). The parties dispute whether Photon was entitled to referral fees for the renewal sales to Mars.

### 6.     Bayer Transaction

In April 2018, Acquia sold approximately € 1.3 million of products to Bayer AG in connection with Bayer's "Web Site Factory Replatforming" project.  (*Id.* ¶ 12).  Another partner of Acquia's, called Possible Worldwide, LLC, had introduced Acquia to Bayer in 2016, and Acquia had executed multiple transactions with Bayer over the following year.  (*Id.*).

The April 2018 Bayer sale was the subject of a Request for Proposal ("RFP").  Photon, along with multiple other referral partners, participated in the RFP process that eventually led to the closing of the Bayer deal.  (*Id.*; *see* Shenberger Decl. Ex. H).  Acquia's internal business-opportunity tracking system lists Possible Worldwide as the partner that initially referred the

---

[4] Acquia also paid Photon a $3,961.50 fee after Mars made an additional purchase by upgrading its subscription.  (Shenberger Decl. ¶ 11).  That fee is not at issue in this case.

Bayer opportunity to Acquia.  (Pinta Decl. Ex. R).  The same system also lists Photon as "Partner Co-Sell #1" for that deal.  (*Id.*).  Nevertheless, Acquia did not pay Photon any fees in connection with the Bayer opportunity.  Plaintiff maintains that it sourced and co-sold the Bayer opportunity and that it is entitled to a 15 percent referral fee on the deal and on subsequent renewals.

### 7.    Termination of the BPRA

On February 28, 2020, the parties discussed the terms of the referral fees by email.  (Shenberger Decl. ¶ 13; *see* Shenberger Decl. Ex. I).  An email sent by Michael Levine, Photon's Senior Vice President of Marketing and Partnerships, to Acquia stated

> We would like all commission terms regardless if it's a referral, co-sell, and regardless if we win the [systems integration] portion or not, to be set at 15% [of] the value of the license and any future expansion deals.  We would like this to be retro-active to all these deals currently[*sic*] as well.

(Shenberger Decl. Ex. I).  The parties dispute whether the email reflects an attempt by Photon to renegotiate the terms of the BPRA or a request by Photon that Acquia comply with the original terms of the deal.  It is undisputed that Acquia did not change its practices in response to Levine's email.  (Shenberger Decl. ¶ 13; *see* Shenberger Decl. Ex. I).

On January 22, 2021, Acquia terminated the BPRA after Photon filed suit against it in San Francisco.  (Shenberger Decl. ¶ 14; Schwartz Decl. ¶ 2).  That suit was later dismissed on jurisdictional grounds.  (Schwartz Decl. ¶ 2).

### B.    Procedural Background

Plaintiff brought this suit on December 2, 2022.  The complaint asserts claims for breach of contract (Count 1) and breach of the implied covenant of good faith and fair dealing (Count 2).

Defendant has moved for summary judgment.  It asserts that at the time of the BPRA's execution, plaintiff was bound by the terms of the hyperlinked documents, including the 2015

Referral-Fee Terms, because they were incorporated into the BPRA by reference.  It further asserts that under section 1 of the BPRA, it was permitted to change the referral-fee terms without plaintiff's written consent.  Thus, it contends that the 2018 Revised Terms were binding on plaintiff.  It also maintains that it validly reduced plaintiff's partnership status to the foundation level.  Taken together, defendant contends that it does not owe any additional fees to plaintiff for the Mars opportunity.  And it further asserts that it does not owe plaintiff any fees for the Bayer opportunity because the undisputed evidence shows that plaintiff did not source or co-sell the deal.

Plaintiff disputes, among other things, the existence and contents of the 2015 Referral-Fee Terms; the permissibility of instituting the 2018 Revised Terms without its written consent; its partnership status at the relevant times; and its degree of involvement in the Bayer opportunity.

## II.    <u>Standard of Review</u>

The role of summary judgment is "to pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial."  *Mesnick v. General Elec. Co.*, 950 F.2d 816, 822 (1st Cir. 1991) (quoting *Garside v. Osco Drug, Inc.*, 895 F.2d 46, 50 (1st Cir. 1990)).  Summary judgment shall be granted when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A genuine issue is "one that must be decided at trial because the evidence, viewed in the light most flattering to the nonmovant, would permit a rational factfinder to resolve the issue in favor of either party."  *Medina-Munoz v. R.J. Reynolds Tobacco Co.*, 896 F.2d 5, 8 (1st Cir. 1990) (citation omitted).  In evaluating a summary judgment motion, the court indulges all reasonable inferences in favor of the nonmoving party.  *See O'Connor v. Steeves*, 994 F.2d 905, 907 (1st Cir. 1993).  When "a properly supported motion for summary judgment is made, the adverse

party must set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986) (quotations omitted).  The nonmoving party may not simply "rest upon mere allegation or denials of his pleading," but instead must "present affirmative evidence."  *Id.* at 256-57.

### III.    Analysis

#### A.    Legal Standard

As noted, the complaint asserts claims of (1) breach of contract and (2) breach of the implied covenant of good faith and fair dealing.

##### 1.    Breach of Contract

Under Massachusetts law, a breach-of-contract claim requires a plaintiff to demonstrate that (1) "there was an agreement between the parties"; (2) "the agreement was supported by consideration"; (3) "the plaintiff was ready, willing, and able to perform his or her part of the contract"; (4) "the defendant committed a breach of the contract"; and (5) "the plaintiff suffered harm as a result."  *Thermal Eng'g Int'l (USA) Inc. v. Lanaville*, 646 F. Supp. 3d 202, 205 (D. Mass. 2022).

 "[U]nder Massachusetts law, interpretation of a contract is ordinarily a question of law for the court[.]"  *Bank v. International Bus. Machs. Corp.*, 145 F.3d 420, 424 (1st Cir. 1998) (internal quotation marks and citation omitted).  "If a contract is unambiguous, it must be enforced according to its plain terms."  *Salls v. Digital Fed. Credit Union*, 349 F. Supp. 3d 81, 86 (D. Mass. 2018).  However, if it is ambiguous, "its interpretation is a question of fact for the jury."  *Id.* (citing *Gillentine v. McKeand*, 426 F.2d 717, 721 (1st Cir. 1970)).  Whether the terms of a contract are ambiguous is a question of law.  *Id.*  "Terms will be found ambiguous only when they 'are inconsistent on their face or where the phraseology can support reasonable difference of opinion as to the meaning of the words employed.'"  *Id.* (quoting *Fashion House,*

*Inc. v. K Mart Corp.*, 892 F.2d 1076, 1083 (1st Cir. 1989)).  However, "[a]mbiguity is not created merely because the litigants disagree about the meaning of a contract."  *Nicolaci v. Anapol*, 387 F.3d 21, 26 (1st Cir. 2004).

### 2.    Breach of the Implied Covenant of Good Faith and Fair Dealing

A covenant of good faith and fair dealing is implied in every contract and provides that "neither party shall do anything that will have the effect of destroying or injuring the rights of the other party to receive the fruits of the contract."  *Speakman v. Allmerica Fin. Life Ins.*, 367 F. Supp. 2d 122, 132 (D. Mass. 2005) (quoting *Anthony's Pier Four, Inc. v. HBC Associates*, 411 Mass. 451, 471-72 (1991)).  "[T]he purpose of the covenant is to guarantee that the parties remain faithful to the intended and agreed expectations of the parties in their performance."  *UNO Restaurants, Inc. v. Boston Kenmore Realty Corp.*, 441 Mass. 376, 385 (2004).

To prevail, the plaintiff must "present evidence of bad faith or an absence of good faith," *Young v. Wells Fargo Bank, N.A.*, 717 F.3d 224, 238 (1st Cir. 2013), indicating that the defendant "unfairly leverag[ed] the contract terms for undue economic advantage," *Blake v. Pro. Coin Grading Serv.*, 898 F. Supp. 2d 365, 389 (D. Mass. 2012).  Breach of an express term of the contract is not a prerequisite to finding a breach of the implied covenant.  *See Speakman*, 367 F. Supp. 2d at 132.  The essential inquiry is whether the challenged conduct "conformed to the parties' reasonable understanding of performance obligations, as reflected in the overall spirit of the bargain, not whether the defendant abided by the letter of the contract in the course of performance."  *Id.*

The requirement of good-faith performance is, however, circumscribed by the obligations in the contract.  *AccuSoft Corp. v. Palo*, 237 F.3d 31, 45 (1st Cir. 2001).  Thus, the covenant may not be invoked to create rights and duties not contemplated by the provisions of the contract or the contractual relationship.  *Speakman*, 367 F. Supp. 2d at 132.

B.      **Terms of the BPRA**

1.      **Hyperlinked Documents**

As an initial matter, the parties dispute whether two hyperlinked documents—the

Program Terms and the 2015 Referral-Fee Terms—are incorporated into the BPRA by reference,

and, by extension, whether they are binding on the parties.

"Incorporation by reference is a common tool in the drafting of contracts." *Artuso v.

Vertex Pharms., Inc.*, 637 F.3d 1, 7 (1st Cir. 2011).  To effectively incorporate an extrinsic

document into a contract, "the language used in the contract . . . [must] clearly communicate []

that the purpose of the reference is to incorporate the referenced material into the contract[,]

rather than merely to acknowledge that the referenced material is relevant to the contract [as, for

example,] background law or negotiating history."  *Greene v. Ablon*, 794 F.3d 133, 145 (1st Cir.

2015) (internal quotation marks and citation omitted).  Typically, "incorporation by a clearly

stated general reference will suffice."  *Id.* (quoting *Chicopee Concrete Serv., Inc. v. Hart Eng'g

Co.*, 398 Mass. 476, 478 (1986)).  Once incorporated, the referenced document "becomes

constructively a part of the [contract], and in that respect the two form a single instrument."

*Infinity Fluids, Corp. v. Gen. Dynamics Land Sys., Inc.*, 2013 WL 3158094, at *4 (D. Mass. June

19, 2013).

Here, the BPRA explicitly refers to two hyperlinks.  The first is identified in the opening

sentence of the contract, which states in relevant part that "the Program Terms [are] located at

https://www.acquia.com/sites/default/files/collateral/20150417-dspartner-prog-at-glance-

0360.pdf."  (Shenberger Decl. Ex. A).  The second hyperlink is identified in section 6, which

states that defendant will pay plaintiff "the applicable referral fee ("Referral Fee") set forth in the

Referral[-]Fee Terms located here:  https://partners.acquia.com/sites/default/files/[ ]

library/attachment/acquia_partner_rewards_2015.pdf." (*Id.* ¶ 6). That section goes on to state that "[f]or the avoidance of doubt, in order for [Photon] to receive the source, co-sell and bonus Referral Fees totaling 15% *set forth at the link above*, [Photon] must meet the following *nonexhaustive, minimum* criteria . . . ." (*Id.*) (emphasis added).

Based on a plain reading of the contract, each hyperlinked document is clearly referenced, and the contents of those documents are unambiguously intended to be incorporated into the substance of the agreement. *See Greene* 794 F.3d at 145. There is no indication that the documents are meant only to provide background on the parties' negotiations or are otherwise not meant to be part of the terms of the agreement. Thus, the Program Terms and the 2015 Referral-Fee Terms documents that are accessible through the two hyperlinks found in the BPRA are validly incorporated into the contract and are therefore binding on the parties.

In opposition, plaintiff first contends that the hyperlinked documents could not have been incorporated into the contract by reference because (1) the hyperlinks are currently inoperable; (2) defendant did not provide a hard copy of the documents to plaintiff; and (3) plaintiff's employees could not access the hyperlinks during their review and execution of the contract. However, the operability of the links today has no bearing on their status at the time of the contract, and there is no reason why a hard copy, as opposed to an electronic copy, would be required as a matter of law to incorporate the documents. In any event, "in the absence of fraud, one who signs a written agreement is bound by its terms whether he reads and understands it or not." *Greene*, 794 F.3d at 146 (internal quotation marks and citation omitted). Here, plaintiff concedes that it was on notice that the contract contained multiple hyperlinks. It further concedes that it then executed the BPRA. There is also no evidence of fraud on the part of

defendant in its inclusion of the hyperlinks in the BPRA.[5]  Thus, plaintiff is bound by the terms included in the hyperlinked documents.

Plaintiff next asserts that even if the hyperlinked documents are incorporated by reference into the contract, there is still a genuine dispute as to their contents.  Defendant has submitted two documents—attached as Exhibits B and C to Shenberger's declaration—and asserts that those exhibits reflect the original hyperlinked documents.  Exhibit B, referred to as the Program Terms in the BPRA, includes a general overview of defendant's partner program and summarizes the opportunities and expectations of the partnership.  (Shenberger Decl. Ex. B).  The document does not, however, provide detail about the actual terms of the referral fees or payment structure.  Those details are included in Exhibit C, the 2015 Referral-Fee Terms document.  Exhibit C contains the specifications of the referral-fee structure, including the fee cap of $150,000 per qualified-lead sale.  (Shenberger Decl. Ex. C)

Plaintiff disputes the authenticity of the exhibits and maintains that they are in fact different from the original hyperlinked documents.  However, it does not offer any evidence to disprove or otherwise cast doubt on the exhibits' legitimacy.  It does not, for example, submit alternate versions of the documents or explain why the exhibits are false representations of the originals.  Rather, it merely contends that in his review of the BPRA, plaintiff's Chief Financial Officer, Sanjiv Lochan, "d[id] not recall seeing any term [in the contract] that placed a cap on the amount of commissions" that plaintiff could earn and that plaintiff "would never have signed" the BPRA had he known about a fee limit.  (Lochan Decl. ¶¶ 4-5).

---

[5] Conceivably, if defendant deliberately interfered with plaintiff's ability to access the documents set forth in the hyperlinks, it might be found to have thereby breached the implied covenant of good faith and fair dealing. However, there is no evidence in the record that defendant did so here.

A failure to recall certain details contained in a document does not raise a genuine dispute as to the authenticity of that document. *See, e.g.*, *I.V. Servs. of Am., Inc. v. Inn Dev. & Mgmt., Inc.*, 182 F.3d 51, 56 (1st Cir. 1999) (stating that "deposition testimony that [an employee] did not remember" a fact is "not enough" to raise a genuine issue of material fact). Nor does a genuine dispute arise from a plaintiff's assertion that it would not have signed a contract had it understood the terms of the agreement. *See Schofield v. French*, 36 F. Supp. 2d 481, 486 (D.R.I. 1999), *aff'd*, 215 F.3d 1312 (1st Cir. 2000) (stating that a party's testimony that he "would not have signed [a contract] if he understood its terms" does not raise a genuine dispute as to the existence of the contract). Thus, the fact that Lochan could not recall the presence of fee limits in the 2015 Referral-Fee Terms document does not raise a genuine dispute as to whether the exhibits accurately reflect the original versions of the hyperlinked documents. Plaintiff is therefore bound by the terms of those incorporated documents.

## 2.    2018 Revisions to the Referral-Fee Terms

Defendant next asserts that its 2018 Revised Terms document validly changed the 2015 Referral-Fee Terms and that plaintiff is therefore bound by the changes. The revisions modified the referral-fee structure in multiple ways, including by placing a cap on foundation-level partnership fees and making explicit the prohibition on referral fees for subscription renewals. (Shenberger Decl. Ex. G). In opposition, plaintiff asserts that it did not consent to the 2018 Revised Terms and did not receive notice of them, as required under the BPRA, rendering the changes invalid.

The parties dispute which provision of the BPRA governs defendant's authority to amend the terms of the referral fees. Defendant asserts that it was permitted to change the terms of the agreement unilaterally under section 1, which states in relevant part that "Program Terms are subject to change and/or discontinuance upon thirty (30) days['] notice to [Photon] via Acquia's

Business Partner Portal."  (Shenberger Decl. Ex. A ¶ 1).  Defendant contends that the phrase

"Program Terms" broadly encapsulates the terms of the partnership program in its entirety,

including the terms related to partner referral fees set forth in section 6.  Defendant therefore

asserts that it was free to change the referral-fee terms without plaintiff's consent, subject to the

notice requirement.

However, as plaintiff emphasizes, the phrase "Program Terms" is a defined term in the

BPRA.  "Where the parties to a contract take pains to define a key term specially, their dealings

under the contract are governed by that definition," rather than the "ordinary meaning" of the

term.  *In re Blinds to go Share Purchase Litig.*, 443 F.3d 1, 7 (1st Cir. 2006).  Thus, section 1 of

the BPRA permits defendant to change the "Program Terms" as specifically defined in the

contract, not as a general reference to the program terms as a whole.

A plain reading of the BPRA indicates that "Program Terms" is defined to refer to the

contents of the hyperlinked document attached to Shenberger's declaration as Exhibit B.  The

document provides a general overview of the partnership program.  (Shenberger Decl. Ex. B).

However, it does not provide any information regarding the structure of the referral fees.  As

Shenberger conceded in her deposition, the document "does[ not] go into great detail about

commission calculations."  (Pinta Decl. Ex. B).  The document's only concrete reference to

partner referral fees is located on the final page, which indicates that partners at all levels can

earn referral fees, but does not set forth the components, calculation, or amount of any such fees.

(Shenberger Decl. Ex. B).  Thus, while section 1 permits defendant to unilaterally change the

Program Terms, that authority does not apply to the specific terms of the partner referral fees set

forth in section 6.

Instead, as plaintiff asserts, changes to the structure of the referral fees are subject to section 15, which states in relevant part that "[t]he Agreement and all of its provisions may not be amended or waived unless agreed upon in writing signed by the parties hereto." (Shenberger Decl. Ex. A ¶ 15). The term "Agreement" is specifically defined as the entire BPRA. (Shenberger Decl. Ex. A). That includes section 6, which sets forth the specific terms of the partner referral fees in the hyperlinked 2015 Referral-Fee Terms document. (*See* Shenberger Decl. Ex. C). Again, that document describes the details of the fee structure including, for example, the specific calculation of the referral fees, the applicable fee limits, and the prerequisites to earning fees. (*Id.*).

Unlike changes to the Program Terms document—which are governed by the specific language in section 1—changes to the referral-fee terms are not subject to any separate, specific provision. *See Life Skills, Inc. v. Harleysville Ins. Co.*, 744 F. Supp. 3d 124, 131 (D. Mass. 2024) (stating that "under Massachusetts law, more specific contract terms ordinarily control over more general contract terms"). Thus, under section 15, changes to the program's referral-fee terms set forth in section 6 require written consent from both parties to the contract. There is no genuine dispute that defendant did not receive plaintiff's written consent before implementing the 2018 Revised Terms. Those attempted changes are therefore not binding on plaintiff.[6] Instead, the terms set forth in the initial BPRA, including the 2015 Referral-Fee Terms, control.

### 3.    Plaintiff's Partnership Status

Defendant next contends that it validly downgraded plaintiff's partnership status from the preferred level to the foundation level in January 2016. Under section 2 of the BPRA, plaintiff

---

[6] Because the 2018 Revised Terms document is not binding on the parties, the Court need not consider whether defendant sufficiently provided notice to plaintiff of the revisions under section 1 of the BPRA, which requires 30 days' notice of any changes to the Program Terms document.

entered the agreement at the preferred-partner level.  (Shenberger Ex. A ¶ 2).  However, to

maintain that partnership status, plaintiff was required to certify six personnel by December 31,

2015.  (*Id.*).  Failure to do so gave defendant the right, "in its sole discretion, to downgrade

[plaintiff's] partner status[.]"  (*Id.*).  The agreement also permitted defendant, "in its sole

discretion, to *upgrade* [plaintiff] to a higher partner level" at any time.  (*Id.*) (emphasis added).

Either way, the contract stated that "[a]ll changes to a partner level [would] be communicated to

[plaintiff]."  (*Id.*)

There is no dispute that plaintiff failed to certify six engineers by December 31, 2015,

and that defendant therefore had the right to downgrade plaintiff's partner status in January 2016.

However, the parties contest whether defendant did, in fact, exercise its right to downgrade

plaintiff.[7]

The Court need not now resolve that dispute.  Plaintiff's partnership status is relevant to

the case only insofar as it affects its entitlement to referral fees, including under any applicable

fee caps.  But under the 2015 Referral-Fee Terms document, which contains the binding set of

referral-fee terms, plaintiff's referral fees are not affected by its partnership status.  There is no

mention of partnership status in that document, and the BPRA does not otherwise distinguish

plaintiff's fee-earning potential based on its partnership status.

Defendant instead relies on the 2018 Revised Terms document—which purported to

institute a 5 percent cap on commissions for foundation-level partners—to assert that plaintiff's

---

[7] Plaintiff asserts that it remained a preferred partner because it did not receive notice of the purported status downgrade, as required under the BPRA, and because defendant paid plaintiff preferred-partner-level commissions well after January 2016.  In response, defendant contends that plaintiff's failure to recall whether it received notice does not constitute a genuine issue of fact.  Defendant further contends that it elevated plaintiff's partnership status in 2019 on its own accord, after plaintiff helped close the initial Mars transaction.  There is no evidence that defendant gave notice to plaintiff about that purported status upgrade.  In any event, the Court need not resolve whether defendant's partnership status was effectively downgraded at this stage.

downgraded status in January 2016 limited its fee-earning potential.  But, for the reasons stated, the 2018 Revised Terms document was not enforceable because plaintiff did not provide its written approval to the changes.

Without any relevant terms in the BPRA tying plaintiff's ability to earn referral fees to its partnership status, the Court need not determine at this stage whether defendant properly effectuated a status downgrade.

### C.    Plaintiff's Entitlement to Referral Fees

#### 1.    Mars Transaction

Defendant next contends that it did not breach the BPRA in connection with the Mars opportunity because it paid plaintiff all the fees to which it was entitled.  Plaintiff received a 5 percent fee of $17,250 on the initial sale of $345,000 and no fees on subsequent renewals of the Mars deal.[8]

##### a.    Initial Sale

Starting with the initial sale, plaintiff asserts that it was entitled to a 15 percent fee of $51,750 because it both referred and co-sold the Mars opportunity to defendant.  Under the 2015 Referral-Fee Terms, plaintiff was entitled to a 5 percent fee for sourcing an opportunity for defendant; an additional 5 percent fee for co-selling an opportunity; and a 5 percent bonus for both sourcing and co-selling the same deal.  (Shenberger Decl. Ex. C).

Here, the parties do not dispute that plaintiff referred the initial Mars opportunity to defendant.  Nor does there appear to be any dispute that plaintiff also co-sold the opportunity.  (*See* Pinta Decl. Ex. G).  Rather, defendant principally contends that under the 2018 Revised

---

[8] Defendant also paid plaintiff a 15 percent fee of $3,961.50 on a separate add-on sale to Mars.  The parties do not contest that payment here.

Terms, plaintiff's fee-earning potential was capped at 5 percent on any sale to a Qualified Lead because of its understanding that plaintiff was a foundation-level partner at the time. Again, however, because the 2018 Revised Terms do not apply, plaintiff was not subject to the 5 percent cap on its fees. And defendant does not contend that the governing 2015 Referral-Fee Terms capped plaintiff's fees at 5 percent. Thus, defendant has not established as a matter of law that it did not breach the contract or interfere with plaintiff's ability to "receive the fruits of the contract" in relation to the initial Mars transaction. *Speakman*, 367 F. Supp. 2d at 132. Summary judgment will therefore be denied as to that issue under Counts 1 and 2.[9]

### b. Renewal Sales

After its initial sale to Mars, defendant renewed the deal multiple times, but did not pay any fees to plaintiff on those renewal transactions. Defendant contends that it was not obligated to do so under either the 2015 Referral-Fee Terms or the 2018 Revised Terms.[10] However, plaintiff maintains that it was entitled to 15 percent fees on all renewal sales to Mars.

As both parties acknowledge—and unlike the 2018 Revised Terms—the 2015 Referral-Fee Terms document makes no mention of deal renewals and the corresponding referral-fee applicability. The parties dispute the implication of that omission.

In general, "the rights of the parties are limited by the terms expressed in the contract." *Saccucci Auto Grp., Inc. v. Am. Honda Motor Co.*, 617 F.3d 14, 23 (1st Cir. 2010). When a

---

[9] Defendant cites a February 2020 email from plaintiff's representative, Michael Levine, to defendant stating that plaintiff "would like all commission terms . . . to be set at 15% [of] the value of the license and any future expansion deals" and that it "would like this to be retro-active." (Shenberger Decl. Ex. I). Defendant asserts that the email undisputably proves that plaintiff knew that it was not entitled to 15 percent fees under the BPRA. However, as plaintiff asserts, the email could also be understood as a request by plaintiff that defendant comply with the original terms of the deal. In any event, the 2015 Referral-Fee Terms govern.

[10] Again, defendant's assertion that the 2018 Revised Terms explicitly and repeatedly state that referral fees are not available on renewal deals is not relevant because those revised terms were not binding on the parties.

contract enumerates specific terms, a party is generally prohibited from attempting to interpret the contract to include a non-expressed term. *See Speakman*, 367 F.Supp.2d at 135-36. Indeed, claims of breach of contract and the implied covenant may not be used to "inject terms [that] the parties could[ have] included but chose not to." *See Guldseth v. Fam. Med. Assocs. LLC*, 45 F.4th 526, 538 (1st Cir. 2022).

Here, nothing in the BPRA suggests that plaintiff was entitled to referral fees on renewal deals. The 2015 Referral-Fee Terms document specifies that referral fees are paid only on sales that are sourced or co-sold by plaintiff. (Shenberger Decl. Ex. C). Although plaintiff sourced and co-sold the initial Mars deal, there is no dispute that it did not participate in the subsequent renewals of the initial deal. And the terms provide no indication that plaintiff would automatically be entitled to recurring referral fees on renewals of deals that it initially sourced or co-sold.[11]

Plaintiff could have negotiated for such a term to be included in the contract. Indeed, it asserts that prior to executing the BPRA, it discussed with defendant the possibility of extending its referral-fee-earning rights beyond the first year of a qualified deal. But there is no evidence that the parties then agreed that plaintiff would earn referral fees on renewals, and it is undisputed that the BPRA does not expressly grant plaintiff such a right. And, tellingly, a separate provision of the BPRA does expressly provide the opportunity for plaintiff to earn so-

---

[11] Plaintiff asserts that the explicit language in the 2018 Revised Terms document to exclude renewal deals from referral-fee eligibility implies that referral fees were previously available on renewals. But there is no evidence to suggest that the parties intended for that to be the case at the time of the BPRA's execution, and the language in the 2018 Revised Terms document is not inconsistent with a reading of the 2015 Referral-Fee Terms to exclude renewal deals.

called "influence fees"—which are not at issue in this case—on renewal deals, further indicating that *referral fees* were not intended to be available on renewal deals.[12]

Defendant did not therefore breach an express provision of the contract. And this is not a situation in which defendant interfered with plaintiff's ability to reap the fruits of the contract. Rather, the contract itself did not bestow a right on plaintiff to earn fees on renewal deals in perpetuity. Accordingly, defendant did not, as a matter of law, breach the contract or the implied covenant of good faith and fair dealing in refusing to pay plaintiff referral fees on its renewal business with Mars. Summary judgment will therefore be granted as to that issue under Counts 1 and 2.

## 2.    **Bayer Transaction**

Defendant contends that it did not breach the BPRA in connection with the Bayer transaction because plaintiff was not entitled to any fees for that deal. Specifically, it asserts that plaintiff did not attempt to register Bayer as a Qualified Lead, and even if it had, defendant had already been made aware of the Bayer opportunity, foreclosing any potential right of plaintiff to referral fees. Plaintiff maintains that it was entitled to a 15 percent commission on the initial sale to Bayer because it sourced the opportunity and co-sold it to defendant.[13]

### a.    **Sourcing**

Defendant asserts that plaintiff is not entitled to a 5 percent fee for sourcing the Bayer opportunity because it did not initially qualify the deal, as required under the BPRA. To earn a

---

[12] Section 7 of the BPRA enables plaintiff to earn "influence fees" for providing certain forms of assistance to defendant in the sale of its products. (Shenberger Decl. Ex. A ¶ 7). Influence fees are distinct from referral fees, and the determination of any influence fees to be paid is "made solely by [defendant]." (*Id.*). The BPRA expressly states that under certain circumstances, influence fees may be earned on renewal sales. (*Id.*). There is no assertion that plaintiff was entitled to influence fees in connection with the Mars deal.

[13] Plaintiff further maintains that it was entitled to referral fees on all subsequent renewal deals involving Bayer. However, for the reasons stated, plaintiff was not entitled to referral fees on renewals under the governing terms of the BPRA. Thus, defendant was not obligated to pay fees to plaintiff on the Bayer renewal deals.

sourcing-related referral fee, plaintiff was required to identify and qualify a potential customer. (Shenberger Decl. Ex. C). To qualify a customer, plaintiff was required to complete a deal-registration form and submit it via defendant's web portal. (Shenberger Decl. Ex. A ¶ 5). Under section 5 of the BPRA, defendant could reject a proposed customer lead for a number of reasons, including having already received a referral for the same opportunity from a different partner. (*Id.*).

In her declaration, Shenberger asserts that plaintiff never submitted a deal-registration form for the Bayer opportunity, and that defendant never accepted Bayer as a plaintiff-registered Qualified Lead. (Shenberger Decl. ¶ 12). Instead, defendant had been introduced to the opportunity by a different partner, Possible Worldwide, in 2016. (*Id.*).

Plaintiff does not provide evidence sufficient to raise a genuine dispute as to its failure to source the Bayer opportunity for defendant. There is no evidence rebutting the assertion that Possible Worldwide introduced defendant to the Bayer opportunity in 2016. Nor is there evidence that plaintiff submitted a deal-registration form before the Bayer opportunity closed in April 2018. Indeed, in a January 2020 email to defendant, plaintiff's representative, Matt Stone, asserts that plaintiff referred Bayer to defendant in 2019, well after the transaction at issue had closed. (Pinta Decl. Ex. K).

In his deposition, plaintiff's employee, Michael Levine, asserted that plaintiff did submit a deal-registration form, but he concedes that he "[doesn't] have a confirmation" of the registration and does not specify the date of the asserted registration. (Pinta Decl. Ex. F). In any event, there is evidence that a different partner had already referred the Bayer opportunity to defendant in 2016. Defendant was therefore entitled to reject any subsequent referral from plaintiff for the same opportunity. Thus, plaintiff was not entitled to any sourcing-related

referral fees in connection with the Bayer opportunity.  Summary judgment will be entered as to that issue under Counts 1 and 2.

### b.  Co-Selling

Defendant next asserts that plaintiff was not entitled to a 5 percent fee for co-selling the Bayer opportunity because (1) plaintiff did not initially refer and qualify—that is, source—the deal and (2) there is no evidence that plaintiff attempted to co-sell the deal.

As an initial matter, under the 2015 Referral-Fee Terms, co-sell-related referral fees could be earned independently of sourcing-related referral fees.  Indeed, the terms state that plaintiff could "register as the sourcing partner, co-selling partner[,] or both, making 3 reward scenarios possible."  (Shenberger Decl. Ex. C).  Thus, plaintiff could earn a 5 percent fee for "co-sell[ing] an opportunity qualified by Acquia *or another partner*," not just those opportunities that plaintiff had itself qualified.  (*Id.*) (emphasis added).  The fact then that plaintiff did not initially source and qualify the Bayer opportunity does not foreclose the possibility that plaintiff could earn a 5 percent co-sell-related referral fee, as long as it met the co-sell requirements set forth in the BPRA and 2015 Referral-Fee Terms.

Defendant nonetheless asserts that plaintiff has "produced no evidence that . . . [it] attempted to co-sell . . . the Bayer opportunity."  (Schwartz Decl. ¶ 9).  But plaintiff has submitted defendant's internal business record that tracks the Bayer opportunity.  That file lists plaintiff as "Partner Co-Sell #1" for the Bayer opportunity, suggesting that plaintiff plausibly co-sold the transaction.  (Pinta Decl. Ex. R).  Moreover, defendant concedes that plaintiff assisted in the Bayer sale to some degree.  (Def.'s Rep. at 13; *see* Shenberger Decl. Ex. H).  Plaintiff has therefore raised a genuine factual dispute as to its level of involvement in the Bayer sale and, by extension, its entitlement to co-sell-related referral fees.  Accordingly, summary judgment will be denied as to that issue under Counts 1 and 2.

**IV.**    <u>**Conclusion**</u>

For the foregoing reasons, defendant's motion for summary judgment is GRANTED in part and DENIED in part.  The motion is granted as to the claims under Counts 1 and 2 relating to referral fees for renewals of the Mars Information Services, Inc. deal; the sourcing of the Bayer AG opportunity; and renewals of the Bayer AG deal.  The motion is otherwise denied.


**So Ordered.**


                                                          /s/ F. Dennis Saylor IV                         
                                                          F. Dennis Saylor IV
Dated:  August 8, 2025                    United States District Judge